FILED

03/14/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0552

DA 21-0552

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2023 MT 44

STEPHANIE KIPFINGER, BEN CUNNINGHAM,
Individually and in a Parental Representative Capacity for E.C., a Minor,

Plaintiffs and Appellants,

v.

GREAT FALLS OBSTETRICAL & GYNECOLOGICAL ASSOCIATES,
& DR. JULIE KUYKENDALL, MD,

Defendants and Appellees.

APPEAL FROM:     District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADV-17-699(b)
Honorable Elizabeth A. Best, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Daniel J. Flaherty, Flaherty Gallardo Law Office, Great Falls, Montana

William V. Ballew, Ballew Legal, P.C., Missoula, Montana

Michael L. Brooks, The Brooks Law Firm, Oklahoma City, Oklahoma

Paul Gallardo, Attorney at Law, Great Falls, Montana

Nicholas C. Rowley, Benjamin Novotny, Trial Lawyers for Justice, Decorah, Iowa

For Appellees:

Gary D. Kalkstein, Joe Newman, Hall Booth Smith, P.C., Missoula, Montana

Submitted on Briefs:  October 5, 2022

Decided:  March 14, 2023

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Plaintiffs Stephanie Kipfinger and Ben Cunningham (Kipfinger) appeal the September 2021 judgment of the Montana Eighth Judicial District Court, Cascade County, granting summary judgment to the defendants on Kipfinger's asserted medical malpractice claim against Dr. Julie Kuykendall, MD, and Great Falls Obstetrical and Gynecological Associates (GFOGA) (collectively, Dr. Kuykendall). We address the following restated issue:

> *Whether the District Court erroneously granted summary judgment to Dr. Kuykendall on Kipfinger's medical malpractice claim due to failure to present sufficient supporting expert medical testimony?*

We reverse and remand for further proceedings.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 At 12:07 a.m. on Saturday, January 9, 2016, four days past her estimated 40-week due date, a pregnant Stephanie Kipfinger presented and was admitted for labor and childbirth at Benefis Hospital in Great Falls, Montana. Dr. Kuykendall was an independent, board-certified obstetrician-gynecologist (OB/GYN) who was not a Benefis employee, but who was on-call at the hospital that morning "covering call . . . for other [GFOGA] providers."[1] Upon review of Kipfinger's prenatal care records, Dr. Kuykendall found nothing significantly noteworthy in the pre-admission progress of the pregnancy. Soon after admission, an attending nurse placed an external lead on Kipfinger's abdomen

---

[1] One of Dr. Kuykendall's GFOGA practice partners had been Kipfinger's prenatal care provider.

for electronic fetal heart rate monitoring (EFM). In addition to a real-time display, the EFM equipment produces a remotely-reviewable record of fetal heart rate (FHR) "tracings" indicating various measured data including, *inter alia*, the measured heart rate of the fetus in relation to the patient's prepartum contractions. FHR tracings typically indicate whether the fetus is sufficiently oxygenated or, alternatively, at risk of hypoxic brain injury resulting from low oxygen supply.[2]

¶3     In that regard, the question of whether the M. R. Civ. P. 56 record is sufficient to preclude summary judgment as to whether Dr. Kuykendall breached the applicable standard of obstetric care necessarily requires background definitions of various technical medical terms as presumed and frequently referenced throughout the pertinent expert disclosures, deposition colloquies, and referenced medical reference materials. For the limited purpose of de novo review of the sufficiency of the Rule 56 factual record regarding the matter at issue, we thus take notice pursuant to M. R. Evid. 202(a)-(c) of the following background facts not subject to genuine material dispute:

Hypoxia: "a deficiency of oxygen reaching the tissues of the body."[3]

---

[2] See *Intrapartum Fetal Heart Rate Monitoring: Nomenclature, Interpretation, and General Management Principles*, American College of Obstetricians and Gynecologists (ACOG) Practice Bulletin No. 106, July 2009, at 1 (Harlass Depo. Ex. 49). See similarly James J. Arnold, DO, and Breanna L. Gawrys, DO, *Intrapartum Fetal Monitoring*, 102(3) Am Fam Physician, 158, 158, Aug. 1, 2020, https://www.aafp.org/pubs/afp/issues/2020/0801/p158.html#afp20200801p158-b5 (EFM "was developed . . . as a screening test for fetal hypoxia/acidosis during labor, specifically to reduce hypoxic-ischemic encephalopathy, cerebral palsy, and fetal death").

[3] *Hypoxia*, *Webster's Third New International Dictionary* (Rev. ed. 2002).

Fetal Acidosis:  a "high hydrogen ion concentration in [body] tissues" which "occurs as a result of tissue hypoxia."[4]  The related term acidemia refers to "a high hydrogen ion concentration in the blood," as "most commonly" measured by pH level, which in turn is "the most easily measured indication of tissue acidosis."[5] Fetal acidosis is classified as "acute (hours) or chronic (days) . . . [and] is often described as respiratory (predominantly due to increased $pCO_2$) or metabolic (predominantly due to increased lactic acid). . . .  [W]hile acute fetal acidosis is almost always initially respiratory, this is quickly followed by mixed respiratory and metabolic acidosis if there is no improvement in oxygenation."[6]

Hypoxic ischemic encephalopathy (HIE):  "a type of brain dysfunction that occurs when the brain doesn't receive enough oxygen or blood flow for a period of time. Hypoxic means not enough oxygen; ischemic means not enough blood flow; and encephalopathy means brain disorder.  HIE may develop during pregnancy, labor and delivery, or in the postnatal period . . . [due to] a number of causes. . . .  If a significant risk factor such as fetal distress or low heart rate occurred during labor and delivery, or the baby needed help with breathing or low heart rate after delivery, HIE may be suspected."[7]

Meconium:  a tar-like substance produced in the gastrointestinal tract of a developing fetus in utero, not usually passed until shortly after birth.[8]

---

[4] Catherine S. Bobrow and Peter W. Soothill, *Causes and Consequences of Fetal Acidosis*, 80 Arch Dis Child Fetal Neonatal Ed, F246, F246 and F248, May 1, 1999, https://fn.bmj.com/content/fetalneonatal/80/3/F246.full.pdf (emphasis added).

[5] *Id*. at F246.  See also Harlass Depo. at 179-80.

[6] *Id*. at F246 (definition of chronic acidosis omitted).

[7] *Neonatal Hypoxic Ischemic Encephalopathy*, University of California San Francisco Benioff Children's Hospitals, https://www.ucsfbenioffchildrens.org/conditions/neonatal-hypoxic-ischemic-encephalopathy (last visited Mar. 9, 2023).  See similarly M. R. Civ. P. 26(b)(4) disclosure report of Dr. Sanjay P. Prabhu, MBBS, DCH, DABR, FRCR, Pediatric Neuroradiologist, Boston Children's Hospital, and Assistant Professor of Radiology, Harvard Medical School (defining HIE as "a clinical syndrome observed in neonates that may be, but not always, due to global *hypoxic-ischemic injury* (HII) to the brain.  HIE is thought to result primarily from decreased blood flow (ischemia) and also decreased oxygen supply (hypoxia) to the neonatal brain . . . before, during, or after birth"—emphasis added).

[8] *Meconium*, *Webster's Third New International Dictionary* (Rev. ed. 2002) ("a dark greenish mass of desquamated cells, mucus, and bile that accumulates in the bowel during fetal life").  See similarly Ankita Goel, MD, and Sushma Nangia, MD, *Meconium Aspiration Syndrome:*

Meconium Aspiration:  occurs when a fetus or newborn "breathes a mixture of meconium and amniotic fluid into the lungs," typically when "stressed during labor [and] especially when . . . past its due date."[9]

Meconium Aspiration Syndrome (MAS):  condition resulting from "ante- or postpartum aspiration of meconium-stained amniotic fluid [(MSAF)] in term or near-term infants resulting in respiratory morbidity of varying severity. . . .  MAS is defined as respiratory distress in a neonate born through [MASF] . . . [and] [i]s one of the most common causes of respiratory morbidity in term newborns requiring neonatal intensive care unit (NICU) stay. . . .   Varied studies have reported . . . advanced gestational age, nonreassuring fetal heart rate, [and] thick meconium . . . as significant risk factors[,] [*inter alia*,] associated with the development of MAS in infants with MSAF."[10]   "Neonates born through [meconium-stained amniotic fluid] often need resuscitation and are at risk of [MAS], . . . hypoxic-ischemic encephalopathy, . . . and death."[11]

¶4    In deposition testimony, Dr. Kuykendall recalled from her first progress note that Kipfinger was experiencing contractions at 2-3 minute intervals and was:

> [i]nitially out of control but did well with two dose[s] Nubain, now appearing mildly uncomfortable, standing at bedside[,] . . . [d]ifficult to monitor due to position and movement.

She explained that:

> many times in early labor people don't want to just lay in bed.  They want to get up and move and stand at the bedside, which is totally appropriate and

---

*Challenges and Solutions*, 2017:7 Research and Reports in Neonatology 19, 20, Aug. 16, 2017,    https://www.dovepress.com/meconium-aspiration-syndrome-challenges-and-solutions-peer-reviewed-fulltext-article-RRN.

[9] *Meconium Aspiration Syndrome*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/ health/conditions-and-diseases/meconium-aspiration-syndrome (last visited Mar. 9, 2023).

[10] *Meconium Aspiration Syndrome: Challenges and Solutions*, *supra* note 8, at 19-20.

[11] Munmun Rawat, MD, and Sushma Nangia, MD, et al., *Approach to Infants Born Through Meconium Stained Amniotic Fluid:  Evolution Based on Evidence*, 35(9) Am J Perinatol. 815, 815, July 2018, https:// pubmed.ncbi.nlm.nih.gov/29341045/.

acceptable. So we had periods where the baby was off the [FHR] monitor for a bit, but there was really no indication that it had to be on continuously, and that was okay. . . . There was no reason for her to have to be continuously monitored at that point. I felt that it was okay for her to get up and move around freely.

The progress note further indicated a FHR in the range of 140-plus beats per minute, with "decreased variability since last Nubain" and "no decelerations."

¶5 At approximately 12:10 p.m., Dr. Kuykendall found upon examination that Kipfinger's cervix was 70 percent effaced and two centimeters dilated. At approximately 1:40-41 p.m., the nursing staff initiated intravenous administration of Pitocin to Kipfinger as directed by Dr. Kuykendall. Pitocin is a labor-inducing synthetic oxytocin hormone.[12] At 3:08 p.m., an attending nurse notified Dr. Kuykendall of fetal concerns based on apparent or impending FHR abnormalities indicated by the EFM. At 3:24 p.m., Dr. Kuykendall responded and reviewed Kipfinger's EFM tracings "strip," but ordered no change in monitoring or treatment. At 4:10 p.m., upon review of an updated tracings "strip" indicating "nonreassuring" heart rate tracings "remote from delivery,"

---

[12] "Oxytocin is the most commonly used medication for the induction/augmentation of labor. [It] is a synthetic product that is chemically and physiologically identical to the . . . [pituitary] hormone oxytocin." *Optimizing Protocols in Obstetrics: Standard of Care for the Woman for Induction/Augmentation of Labor*, ACOG Series 1, December 2011, at 14 (Harlass Depo. Ex. 46) (hereinafter ACOG Series 1). As pertinent here, synthetic oxytocin is used to stimulate uterine contractions prior to initial onset for facilitation of labor and delivery, or to increase the existing rate of contraction "when there is no progression in labor." ACOG Series 1 at 14. Pitocin is the tradename of a particular oxytocin synthetic. *Oxytocin Dosage to Decrease Induction Duration*, Nat'l Institute of Health U.S. Nat'l Library of Medicine, https://clinicaltrials.gov /ct2/show/NCT03140488 (Dec. 20, 2022). Subsequent references herein to oxytocin and Pitocin are synonymous and interchangeable.

Dr. Kuykendall ordered the nursing staff to move Kipfinger to the operating room for an "urgent primary low transverse cesarean section" (C-Section) procedure.

¶6    Dr. Kuykendall began the C-Section procedure at 4:41 p.m. Upon making the initial uterine incision to expose the fetus for extraction, she noticed "through the membranes" the presence of "meconium" in Kipfinger's amniotic sac. She later testified that she immediately advised the attending surgical nurse of the presence of meconium and told her to summon the hospital's Neonatal Intensive Care Unit (NICU) team. Dr. Kuykendall explained that the level of the NICU team response to a problem delivery generally:

> depends on the clinical situation. If we have a delivery, and a baby is just not transitioning well, then sometimes we will only get a NICU nurse. But if we say there's meconium, then we get the full team capable of intubating and suctioning [the meconium out of the infant's airway and lungs].

She testified further that, in this case, she anticipated that a NICU Respiratory Therapist (RT) able to perform a complete resuscitation of the infant, including intubation as necessary, would immediately respond to the operating room "as fast as possible." She stated that "when we call for a resuscitation or for meconium, the response is almost immediate," on average "between one and three minutes." She clarified, however, that upon seeing meconium through Kipfinger's placental membranes:

> it wasn't clear yet that we needed a full team because the vast majority of babies with meconium come out and yell and scream[,] clear the meconium out on their own[,] and don't require significant intervention. So [I] expect[ed] that they were on the way, but I had no way of knowing . . . [whether] full intervention [would be necessary].

¶7    At 4:47 p.m., Dr. Kuykendall ruptured Kipfinger's placental membranes and extracted the newborn (E.C.). Upon extraction, E.C. was pale in color, not breathing, and

7

had an extremely low heart rate with limp muscle tone and nonresponsive reflexes. In the 8 minutes that passed before a NICU team member arrived, attending labor and delivery transition nurses repeatedly tried but were unable to resuscitate E.C. At 4:55 p.m., a NICU respiratory therapist (RT) arrived in the operating room and attempted to intubate E.C. with an endotracheal tube device intended to suction out the meconium-contaminated amniotic fluid, and establish an airway which would allow the child to breathe. After those intubation efforts failed, the NICU RT sought assistance from an attending non-NICU Certified Registered Nurse Anesthetist (CRNA) who was present to assist with Kipfinger's anesthesia during the C-Section procedure. After an additional 5-6 minutes, the nurse anesthetist was able to successfully intubate E.C., thereby establishing an airway which would allow him to breathe upon resuscitation. After resuscitating E.C. and stabilizing his vital signs, NICU team members moved him from the operating room to the NICU for further care. Later that evening, E.C. was life-flighted to the Seattle Children's Hospital where he was treated for meconium aspiration syndrome (MAS), possible sepsis, pneumothorax (collapsed lung), and hypoxic-ischemic brain injury. E.C. was ultimately diagnosed with HIE, cerebral palsy, developmental delay, and microcephaly, *inter alia*.

¶8      Over three years later, in October 2019, a pediatric neurologist associated with the Stanford University Medical Center conducted an independent medical examination of E.C. at the request of Benefis incident to this litigation. The neurologist found that E.C. remained non-verbal, was "fed exclusively by gastronomy," had "profound intellectual disability," was "fully incontinent," "had cortical visual impairment," and was "fully

8

dependent on others for all cares." The neurologist found no likelihood of "revers[al]" of any of those noted "deficits" and "needs."

¶9 In October 2017, Kipfinger filed a district court complaint asserting various medical negligence claims for compensatory damages against Benefis Health System, Inc. (Benefis). *Inter alia*, the complaint alleged that Benefis hospital staff negligently failed to timely: (1) discontinue administration of Pitocin to Kipfinger; (2) ensure a neonatal intubation team was present or immediately available in the operating room for the C-Section procedure; and (3) intubate the distressed E.C. in a competent manner to aid in resuscitation and breathing. In addition to general denials, Benefis asserted that Dr. Kuykendall, who was not a Benefis employee or agent, was responsible for several of the alleged negligent acts or omissions. In October 2018, Kipfinger filed an amended complaint asserting a medical malpractice claim against Dr. Kuykendall and GFOGA regarding her care of Kipfinger and E.C. on January 9, 2016. At bottom, the claim asserted that Dr. Kuykendall's alleged negligence caused excessive delay in properly oxygenating E.C. and thus, ultimately, his resulting physical and neurological injuries. Dr. Kuykendall and GFOGA answered by general denial of all asserted negligence allegations.

¶10 During the discovery phase of the litigation, the parties disclosed and deposed various medical expert witnesses, including various obstetric and neonatal nurses, OB/GYNs, neonatologists, pathologists, neuroradiologists, and pediatric neurologists, *inter alia*. During the discovery process, Kipfinger timely filed a M. R. Civ. P. 26(b)(4) expert witness disclosure for Dr. Fred Harlass, MD, a retained, double board-certified

OB/GYN and maternal-fetal care specialist. Included, *inter alia*, in the disclosure was Dr. Harlass's January 2020 report asserting various "Care Critiques" pertaining to the obstetric care provided by Dr. Kuykendall and Benefis hospital staff to Kipfinger and E.C. In sum, as pertinent to Dr. Kuykendall, the report asserted that "the care" she "rendered to" Kipfinger and the newborn E.C. "deviat[ed] from the standard of care" insofar that she failed to correctly interpret E.C.'s fetal heart monitor tracings "strips" which then resulted in her compounding:

(1)     failure to timely recognize the transition of the in utero fetus from a Category I risk level to a Category II risk level, and associated FHR abnormalities, and resulting failure to initiate fetal scalp heart rate monitoring to more closely monitor the progress of Kipfinger's labor;

(2)     decision to administer Pitocin in the face of a Category II risk level and associated FHR abnormalities;[13]

(3)     failure to timely recognize the transition from a Category II risk level to a Category III risk level, and resulting indication of amniotic meconium, which would have been indicated upon timely application of fetal scalp heart rate monitoring;

(4)     failure to "discontinue" Pitocin/oxytocin administration at 3:15 p.m., "at the latest," in the face of the transition to an unresolving Category III risk level;

(5)     failure to "call" the C-Section procedure "no later than" 3:20 p.m.;[14] and

---

[13] The report criticized the start of Pitocin in the face of Category III risk level, but Dr. Harlass later clarified at deposition that the report reference to Category III was a typographical error that should have referred to Category II. Harlass Depo. at 279.

[14] Dr. Harlass's report further asserted that Dr. Kuykendall should have also timely performed the C-Section procedure "within 30 minutes" of ordering it. Kipfinger later abandoned this asserted negligence predicate in her Reply Brief at 10, n.1.

10

(6)     failure to ensure upon calling the C-Section procedure that a "neonatal response team" (including a "neonatologist/NNP[15]," "NICU RT," or other NICU team member "capable and experienced with neonatal intubation") was present or available during the high-risk C-section procedure to immediately intubate the newborn as necessary.

As pertinent to Dr. Kuykendall, the Harlass report ultimately asserted that her alleged "deviations from the standard of care were the direct and proximate cause of the [subject] injuries" to E.C., "includ[ing] the lack of adequate oxygenation resulting in" later-diagnosed "hypoxic ischemic encephalopathy, seizures, and related injuries." In April 2020, counsel for Dr. Kuykendall, Benefis, and Kipfinger respectively deposed Dr. Harlass for over six hours regarding his previously disclosed expert opinions regarding the medical care provided by Dr. Kuykendall to Kipfinger and E.C. on January 9, 2016.

¶11    In early 2021, Kipfinger confidentially settled her asserted negligence claims against Benefis, thus resulting in its stipulated dismissal from the action. In June 2021, on various asserted grounds, Dr. Kuykendall and GFOGA filed a M. R. Civ. P. 56 motion for summary judgment on Kipfinger's remaining negligence claims against them. In essence, the motion alleged that Dr. Kuykendall was entitled to summary judgment on the asserted grounds, *inter alia*, that Kipfinger had made insufficient evidentiary showings to prove that:

(1)     Dr. Kuykendall negligently failed to have a resuscitation team capable of immediately intubating E.C. upon extraction because "the need for an intubation team was *not* apparent until *after* [E.C.] was delivered" and "a

---

[15] A neonatologist is a pediatrician who specializes in neonatology, i.e., the branch of medicine concerned with the care, development, and diseases of newborn infants.

provider capable of intubating" him—the attending nurse-anesthetist who ultimately did so—"was present the entire time" (emphasis original);

(2)    any negligence attributed to Dr. Kuykendall was a cause-in-fact of E.C.'s neurological injuries and related disabilities because:

   (a)    a resuscitation team capable of intubating E.C. was in any event not immediately available;

   (b)    the attending nurse-anesthetist nonetheless ultimately intubated E.C. after extraction;

   (c)    Kipfinger's "own neonatology expert" (neonatologist Dr. Steven A. Ringer, MD) testified that Dr. Kuykendall did *not* cause E.C. to suffer *postpartum* hypoxic-ischemic injury because more immediate intubation would not have changed the outcome for a child born with a meconium-obstructed airway and who had already aspirated meconium prior to birth;

   (d)    Dr. Harlass was not qualified under § 26-2-601(1)(a), MCA, to render his asserted causation opinion because his OB/GYN practice admittedly did not include *diagnosing* hypoxic-ischemic encephalopathy; and

   (e)    Dr. Harlass's deposition testimony did not include an opinion, stated on a "more likely than not" basis, that E.C. suffered "intrapartum hypoxic-ischemic injury" because he "changed his mind based on objective criteria" (internal punctuation omitted).

Kipfinger filed a response in opposition asserting various asserted genuine issues of material fact supported by various attached discovery materials including, *inter alia*, an 8-page excerpt from Dr. Harlass's deposition testimony.[16]    After the motion was fully

---

[16] In addition to the parties' previously filed discovery materials, contemporaneously filed with Kipfinger's opposition brief was an accompanying filing captioned as Plaintiff's Statement of Disputed Facts which *inter alia* included attached excerpts from the deposition testimonies of eight different witnesses and Benefis's NICU team attendance treatment/guideline.

submitted on the briefs, and in the absence of a request for hearing, the District Court informally sent a group email to counsel for both parties requesting a complete copy of the entire Harlass deposition for consideration regarding factual issues disputed in the briefing. Kipfinger's counsel provided the complete Harlass deposition to the court without objection from Dr. Kuykendall. The District Court then reviewed and considered the complete Harlass deposition testimony in regard to Dr. Kuykendall's summary judgment motion. However, for reasons unclear from the record on appeal, neither party, nor the court, formally filed the Harlass deposition with the District Court Clerk.[17]

¶12     Three days later, based on "considerable time" spent "reviewing the testimony and law in this case," and upon independent "comb[ing]" of the pertinent "expert depositions and disclosures filed by the Plaintiffs," the District Court issued a written judgment which, *inter alia*, granted summary judgment to Dr. Kuykendall on the standard of care and breach elements of Kipfinger's remaining medical malpractice claim.[18]   The District Court reasoned that the testimonial opinions of various medical experts, other than Dr. Harlass, asserted by Kipfinger were insufficient to preclude summary judgment on those elements

[17] We subsequently granted Kipfinger's uncontested motion on appeal for leave to supplement the appellate record to include the complete Harlass deposition transcript as "considered by the [District Court] to ensure Appellants were treated fairly" below.

[18] The District Court ruled further that it was "unnecessary to address [the] causation and damages" elements of Kipfinger's asserted malpractice claim "[b]ecause the Plaintiffs have [neither] established a standard of care" for OB/GYNs, nor "a departure from the standard of care." In a separate matter, the judgment earlier-denied Dr. Kuykendall's motion for summary judgment that she was not personally liable for any negligence attributed to her because she was at all times acting within the scope of her employment with GFOGA.

because those other medical experts were not OB/GYNs like Dr. Kuykendall, thus leaving the viability of the standard of care and breach elements of the claim solely dependent on Dr. Harlass's stated opinions. As to Dr. Harlass, the court noted that his Rule 26(b)(4) disclosure report stated various opinions alleging multiple errors and omissions by Dr. Kuykendall in her prepartum care of Kipfinger and E.C. The court concluded, however, that Dr. Kuykendall was nonetheless entitled to summary judgment on the standard of care and breach elements of Kipfinger's claim because "Dr. Harlass [did] not express an opinion concerning whether Dr. Kuykendall was required to produce a neonatologist before beginning the C-Section," and none of his other assertions of negligent conduct by Dr. Kuykendall "reflect[] that [those] opinions [were] based on the 'more likely than not' standard" for admission under M. R. Evid. 702. The District Court elaborated that Dr. Harlass "either conceded that his opinion[s]" regarding the applicable OB/GYN standard of care were "not based on a national standard of care" or "that he did not have an opinion at all." Kipfinger timely appeals.

**STANDARD OF REVIEW**

¶13 Summary judgment rulings are subject to de novo review for conformance with applicable M. R. Civ. P. 56 standards and requirements. *Dick Anderson Constr., Inc. v. Monroe Prop. Co.*, 2011 MT 138, ¶ 16, 361 Mont. 30, 255 P.3d 1257. Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). A genuine issue of material fact exists only if the Rule 56 factual record manifests a non-speculative record fact that is

materially inconsistent with proof of an essential element of an asserted claim or defense at issue. *Mt. W. Bank, N.A. v. Mine & Mill Hydraulics, Inc.*, 2003 MT 35, ¶ 28, 314 Mont. 248, 64 P.3d 1048.

¶14 The party seeking summary judgment has the initial burden of showing a complete absence of any genuine issue of material fact on the Rule 56 record and that the movant is accordingly entitled to judgment as a matter of law. *Weber v. Interbel Tel. Coop.*, 2003 MT 320, ¶ 5, 318 Mont. 295, 80 P.3d 88; *Thelen v. City of Billings*, 238 Mont. 82, 85, 776 P.2d 520, 522 (1989). The burden then shifts to the opposing party to either show the existence of a genuine issue of material fact or that the moving party is nonetheless not entitled to judgment as a matter of law. *Osterman v. Sears, Roebuck & Co.*, 2003 MT 327, ¶ 17, 318 Mont. 342, 80 P.3d 435 (citing *Bruner v. Yellowstone Cty.*, 272 Mont. 261, 264, 900 P.2d 901, 903 (1995)). To meet the responsive Rule 56 burden of demonstrating that genuine issues of material fact preclude summary judgment, the non-moving party must in proper form, and by more than mere denial, speculation, or pleading allegation, "set out specific facts" showing the existence of a genuine issue of material fact. M. R. Civ. P. 56(e)(2). *See also Grimsrud v. Hagel*, 2005 MT 194, ¶ 14, 328 Mont. 142, 119 P.3d 47; *Osterman*, ¶ 34; *Old Elk v. Healthy Mothers, Healthy Babies, Inc.*, 2003 MT 167, ¶¶ 15-16, 316 Mont. 320, 73 P.3d 795; *Klock v. Town of Cascade*, 284 Mont. 167, 174, 943 P.2d 1262, 1266 (1997); *Mysse v. Martens*, 279 Mont. 253, 262, 926 P.2d 765, 770 (1996); *Eitel v. Ryan*, 231 Mont. 174, 178, 751 P.2d 682, 684 (1988). The court must view the Rule 56 factual record in the light most favorable to the non-moving party and draw all reasonable

15

inferences in favor thereof. *Weber*, ¶ 5; *Gamble Robinson Co. v. Carousel Properties*, 212 Mont. 305, 311-12, 688 P.2d 283, 286-87 (1984). The Rule 56 factual record includes "the pleadings, the discovery and disclosure materials on file, and any [filed] affidavits." M. R. Civ. P. 56(c)(3). In assessing what reasonable inferences may be drawn in favor of the non-moving party, "the court must consider the entire record." *Jarvenpaa v. Glacier Elec. Co-op., Inc.*, 271 Mont. 477, 480, 898 P.2d 690, 692 (1995) (citing *Smith v. Barrett*, 242 Mont. 37, 40, 788 P.2d 324, 326 (1990)). On de novo review, this Court is then "free to examine the entire record" on appeal "and make appropriate findings" on the record not subject to genuine material dispute. *Hudson v. MacDonald*, 229 Mont. 426, 429, 747 P.2d 221, 223 (1987) (citing *Shimsky v. Valley Credit Union*, 208 Mont. 186, 189-90, 676 P.2d 1308, 1310 (1984)). The lower court has no duty, however, to anticipate or speculate as to the existence of contrary material facts. *Gamble*, 212 Mont. at 312, 688 P.2d at 287 (internal citations omitted). Whether a genuine issue of material fact exists or whether a party is entitled to judgment as a matter of law are conclusions of law reviewed de novo for correctness. *Ereth v. Cascade Cty.*, 2003 MT 328, ¶ 11, 318 Mont. 355, 81 P.3d 463.[19]

---

[19] As a narrow exception to the de novo standard of review under M. R. Civ. P. 56, preliminary rulings admitting or excluding evidence proffered for Rule 56 consideration as to whether the subject evidence issue satisfies or complies with a pertinent rule of evidence or procedure, and thus qualifies for consideration under Rule 56, are, like other evidentiary rulings normally within the discretion of the trial court, subject to review for an abuse of discretion. *McClue v. Safeco Ins. Co. of Ill.*, 2015 MT 222, ¶¶ 12-14, 380 Mont. 204, 354 P.3d 604 (internal citations omitted). *See also, e.g.*, *Butler v. Domin*, 2000 MT 312, ¶¶ 10-17, 302 Mont. 452, 15 P.3d 1189 (applying abuse of discretion standard of review for whether expert testimony meets "more probable than not" standard of M. R. Evid. 702 admissibility). An abuse of discretion occurs when a lower court exercises granted discretion based on a clearly erroneous finding of fact, an erroneous conclusion or application of law, or reasoning that was arbitrary, lacking in conscientious judgment, or in

**DISCUSSION**

¶15 *Whether the District Court erroneously granted summary judgment to Dr. Kuykendall on Kipfinger's medical malpractice claim due to failure to present sufficient supporting expert medical testimony?*

¶16 The essential elements of a negligence claim are the existence of an applicable legal duty owed by the defendant to the claimant, breach of that duty, causation of harm, and resulting pecuniary damages. *Peterson v. Eichhorn*, 2008 MT 250, ¶ 23, 344 Mont. 540, 189 P.3d 615; *Krieg v. Massey*, 239 Mont. 469, 472, 781 P.2d 277, 278-79 (1989); *Mang v. Eliasson*, 153 Mont. 431, 435, 458 P.2d 777, 779-80 (1969). The claimant has the burden of presenting sufficient evidence to prove the factual requirements of each of the requisite elements of a negligence claim by a preponderance of the evidence. *Faulconbridge v. State*, 2006 MT 198, ¶ 77, 333 Mont. 186, 142 P.3d 777; *Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 41, 297 Mont. 336, 993 P.2d 11; *Varn v. Butte Elec. Ry. Co.*, 77 Mont. 124, 129, 249 P. 1070, 1071 (1926). *See similarly* §§ 26-1-401, -402, and -403(1), MCA (civil burdens of proof and persuasion). The preponderance of the evidence standard merely requires proof sufficient to support a conclusion that the asserted existence, non-existence, occurrence, or non-occurrence of the subject fact or factual occurrence was, is, or will be more probable than not, i.e., more likely than not. *Mont. State Univ.-N. v.*

_____

excess of the bounds of reason, thus resulting in substantial injustice. *Larson v. State*, 2019 MT 28, ¶ 16, 394 Mont. 167, 434 P.3d 241; *In re D.E.*, 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586. However, such rulings remain subject to de novo review to the extent based on the interpretation of the legal meaning or requirement of the subject evidentiary or procedural rule. *Howlett v. Chiropractic Ctr., P.C.*, 2020 MT 74, ¶ 15, 399 Mont. 401, 460 P.3d 942; *McClue*, ¶ 15. *See also Steer, Inc. v. Mont. Dep't of Revenue*, 245 Mont. 470, 474-75, 803 P.2d 601, 603-04 (1990) (distinguishing de novo standard of review for conclusions of law from abuse of discretion standard for discretionary trial court rulings).

*Bachmeier*, 2021 MT 26, ¶ 61, 403 Mont. 136, 480 P.3d 233; *Hohenlohe v. Mont. Dep't of Nat. Res. & Conservation*, 2010 MT 203, ¶ 33, 357 Mont. 438, 240 P.3d 628. *Accord Merkel v. Internal Rev. Comm'r*, 192 F.3d 844, 852 (9th Cir. 1999); *Tannehill v. Finch*, 232 Cal. Rptr. 749, 751 (Cal. Ct. App. 1986); *Page v. Clark*, 592 P.2d 792, 800 (Colo. 1979) (quoting McCormick, *The Law of Evidence* § 339 (2d ed. 1972)). While proof of the requisite factual elements of a negligence claim generally involves questions of fact not amenable to summary judgment as a matter of law, summary judgment in favor of a defendant is nonetheless proper if the moving defendant satisfies his or her initial Rule 56 burden of showing entitlement to judgment on any of the requisite elements of the claim at issue based on the complete absence of any genuine issue of material fact, and the non-moving claimant then fails to satisfy his or her responsive burden of making an affirmative showing, based on admissible evidence, that a genuine issue of material fact precludes summary judgment on the subject element(s) of the claim. *Dubiel v. Mont. Transp. Dep't*, 2012 MT 35, ¶ 12, 364 Mont. 175, 272 P.3d 66; *Peterson v. Eichhorn*, 2008 MT 250, ¶ 24, 344 Mont. 540, 189 P.3d 615; *Cusenbary v. Mortensen*, 1999 MT 221, ¶ 21, 296 Mont. 25, 987 P.2d 351; *White v. Murdock*, 265 Mont. 386, 389-90, 877 P.2d 474, 476 (1994). *See also* M. R. Civ. P. 56(c)(3) and (e)(1); *Alfson v. Allstate Prop. & Cas. Ins. Co.*, 2013 MT 326, ¶¶ 11 and 14, 372 Mont. 363, 313 P.3d 107; *Northern Cheyenne Tribe v. Roman Cath. Church ex rel. Dioceses of Great Falls & Billings*, 2013 MT 24, ¶¶ 21 and 40, 368 Mont. 330, 296 P.3d 450; *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 80, 345 Mont.

12, 192 P.3d 186; *Hiebert v. Cascade Cty.*, 2002 MT 233, ¶¶ 27-34, 311 Mont. 471, 56 P.3d 848; *Thelen*, 238 Mont. at 85, 776 P.2d at 522.

      1.  <u>Medical Malpractice Claims – Standard of Care and Breach Elements</u>.

¶17    Medical malpractice is a particular species of professional negligence applicable to health care providers. *See Mont. Deaconess Hosp. v. Gratton*, 169 Mont. 185, 189-90, 545 P.2d 670, 672-73 (1976). *See similarly* §§ 27-6-102 and -103(5), MCA (Mont. Med. Legal Panel Act purpose and "malpractice" definition).[20]  In the context of a physician-patient relationship, the duty element of a medical malpractice claim generally requires qualified expert medical opinion testimony establishing the standard of medical care applicable to the field of medical practice in which the defendant is licensed and in regard to the type of medical care or procedure at issue.  *See* § 26-2-601(1), MCA (2005); *Beehler v. E. Radiological Assocs., P.C.*, 2012 MT 260, ¶¶ 18 and 23-24, 367 Mont. 21, 289 P.3d 131 (internal citations omitted); *Gratton*, 169 Mont. at 189-90, 545 P.2d at 672-73.[21]  As to board-certified specialists in a particular field or practice of medicine, the applicable standard of care is the national standard of care applicable to all such specialists in the provision of the subject specialized care throughout the United States, without regard for lesser geographic limitations. *See Chapel v. Allison*, 241 Mont. 83, 91-93, 785 P.2d 204,

---

[20] *See also Labair v. Carey*, 2012 MT 312, ¶ 17, 367 Mont. 453, 291 P.3d 1160 (elements of professional negligence claim generally correspond to four elements of common negligence claim); *Loudon v. Scott*, 58 Mont. 645, 653, 194 P. 488, 491 (1920) (elements of a medical malpractice claim are essentially similar to those in an ordinary negligence claim).

[21] *Accord Howlett*, ¶ 18; *Horn v. St. Peter's Hosp.*, 2017 MT 298, ¶ 20, 389 Mont. 449, 406 P.3d 932; *Estate of Willson v. Addison*, 2011 MT 179, ¶¶ 17-18, 361 Mont. 269, 258 P.3d 410.

209-10 (1990) (distinguishing "'national' specialist standard" applicable without regard for "geographical limitations" to "any physician who holds himself or herself out" as a "board-certified specialist[] or board-certified general or family practitioner[]" from the lesser standard of care for "non-board-certified general practitioner[s]," i.e., "the standard of care of a "reasonably competent general practitioner acting in the same or similar community in the United States in the same or similar circumstances"). Because "[b]oard certified specialists receive comparable training and pass the same national board certification examination," the standard of care applicable to board-certified physicians is generally the degree of skill and learning possessed and employed by other physicians in good standing practicing in the same specialty with the same national board certification. *Aasheim v. Humberger*, 215 Mont. 127, 130-31, 695 P.2d 824, 826-27 (1985). *Accord Glover v. Ballhagen*, 232 Mont. 427, 429-30, 756 P.2d 1166, 1168 (1988) (applying *Aasheim* national standard of care to board-certified family practitioners).

¶18    Except under narrow circumstances not at issue here, the breach element of a medical malpractice claim generally requires proof, in the form of qualified expert testimony on a more probable than not basis, that the alleged error or omission breached, i.e., deviated from, the applicable standard of medical care. *Howlett v. Chiropractic Ctr., P.C.*, 2020 MT 74, ¶ 18, 399 Mont. 401, 460 P.3d 942; *Beehler*, ¶¶ 18 and 23-24 (internal citations omitted); *Estate of Willson v. Addison*, 2011 MT 179, ¶¶ 17-18, 361 Mont. 269, 258 P.3d 410; *Gratton*, 169 Mont. at 189-90, 545 P.2d at 672-73.  It thus follows that an otherwise qualified physician's testimony as to his or her personal practice is insufficient

alone to establish either the applicable standard of medical care or that a different act or omission deviated therefrom. *Norris v. Fritz*, 2012 MT 27, ¶ 44, 364 Mont. 63, 270 P.3d 79 (citing *Collins v. Itoh*, 160 Mont. 461, 469, 503 P.2d 36, 41 (1972)); *Gratton*, 169 Mont. at 190, 545 P.2d at 673.

¶19 In tandem, M. R. Evid. 702-03 and § 26-2-601, MCA, govern whether a proffered medical expert is qualified to render the expert medical testimony required for proof of the standard of care and breach elements of a medical malpractice claim. *Beehler*, ¶¶ 21-32; *McColl v. Lang*, 2016 MT 255, ¶¶ 16-18, 385 Mont. 150, 381 P.3d 574. In addition to the foundation requirement under M. R. Evid. 702 that a proffered expert be qualified by way of "knowledge, skill, experience, training, or education" to render an opinion on the subject matter at issue, an expert proffered to testify "on issues relating to negligence and standards of care and practice in an action" for medical "malpractice" regarding a physician must be:

(1)    a physician, as defined by § 37-3-102, MCA;

(2)    "licensed as a health care provider in at least one state and routinely treats or has routinely treated within the previous 5 years the diagnosis or condition or provides the type of treatment that is the subject matter of the malpractice claim or is or was within the previous 5 years an instructor of students in an accredited health professional school or accredited residency or clinical research program relating to the diagnosis or condition or the type of treatment that is the subject matter of the malpractice claim"; and

(3)    "show[n] by competent evidence that, as a result of education, training, knowledge, and experience in the evaluation, diagnosis, or treatment of the disease or injury that is the subject matter of the malpractice claim against the health care provider" to be "thoroughly familiar with the standards of care and practice as they related to the act or omission that is the subject matter of the malpractice claim on the date of the incident upon which the malpractice claim is based."

Section 26-2-601(1)-(2), MCA (2005); *Beehler*, ¶¶ 23-24; *McColl*, ¶¶ 16-18.

2. Medical Malpractice Claims – Causation Element.

¶20　As pertinent here, the causation element of a negligence claim requires affirmative proof that the alleged negligent conduct (i.e., alleged breach of a legal duty) was a cause-in-fact (i.e., factual cause) of the alleged harm and resulting damages. *Busta v. Columbus Hosp. Corp.*, 276 Mont. 342, 371, 916 P.2d 122, 139 (1996); *Kitchen Krafters, Inc. v. Eastside Bank of Mont.*, 242 Mont. 155, 166-67, 789 P.2d 567, 574 (1990) (citing *Young v. Flathead Cty.*, 232 Mont. 274, 757 P.2d 772 (1988)), *partially overruled on other grounds by Busta*, 276 Mont. at 370, 916 P.2d at 139.[22]　Except under alternative cause-in-fact standards not pertinent here,[23] alleged negligent conduct was a cause-in-fact if the alleged harm "would not have occurred but for that conduct." *Busta*, 276 Mont. at 371, 916 P.2d at 139 (internal citation and punctuation omitted). *Accord Fisher v. Swift Transp. Co.*, 2008 MT 105, ¶ 36, 342 Mont. 335, 181 P.3d 601 (quoting *Busta*).　In other words, the alleged negligent conduct was a cause-in-fact if it is more probable or likely than not that the alleged harm and resulting damages would not have occurred without or but for the alleged negligent conduct. *See Busta*, 276 Mont. at 370, 916 P.2d at 139; §§ 26-1-401 through -403(1), MCA; *Bachmeier*, ¶ 61; *Hohenlohe*, ¶ 33.　Thus, except

---

[22] *See also* § 27-1-317, MCA (tort causation standard as clarified in *Busta*, 276 Mont. at 370-71, 916 P.2d at 139-40).

[23] *Busta*, 276 Mont. at 371, 916 P.2d at 139 (in re alternative "substantial factor" and "natural and continuous sequence" causation-in-fact tests).

22

under narrow circumstances not at issue here,[24] the causation element of a medical malpractice claim generally requires proof in the form of qualified expert testimony, on a more probable than not basis, that the alleged breach or deviation from the applicable standard of medical care was a cause-in-fact of the alleged injury or condition at issue. *See Howlett*, ¶ 18; *Addison*, ¶¶ 17-18; *Busta*, 276 Mont. at 370-71, 916 P.2d at 139; *Gratton*, 169 Mont. at 189-90, 545 P.2d at 672; §§ 26-1-401 through -403(1), MCA. *See also Dallas v. Burlington N. Inc.*, 212 Mont. 514, 522-23, 689 P.2d 273, 277 (1984) (equating M. R. Evid. 702 more probable than not/more likely than not standard for admission of expert medical opinion as qualitatively similar/synonymous with opinion stated to a reasonable degree of medical certainty)).[25]

¶21     However, in order to avoid elevating semantical form over substantive essence, the question under the M. R. Evid. 702 more probable than not standard is *not* whether a medical expert expressly stated or phrased an opinion in terms of any particular language, term, or phrase, such as, e.g., more probable than not, more likely than not, or to a reasonable degree of medical certainty. *See Beehler*, ¶¶ 35-39; *Ford v. Sentry Cas. Co.*,

---

[24] *See Cain v. Stevenson*, 218 Mont. 101, 105-06, 706 P.2d 128, 131 (1985) (expert medical testimony generally required for injury causation diagnosis and prognosis except where obvious without need for specialized expertise).

[25] *Accord Ford v. Sentry Cas. Co.*, 2012 MT 156, ¶¶ 41-43, 365 Mont. 405, 282 P.3d 687 (equating Rule 702 more probable than not/more likely than not standard of admissibility of expert medical opinion with reasonable medical certainty standard—citing *Dallas*); *State v. Vernes*, 2006 MT 32, ¶¶ 15-19, 331 Mont. 129, 130 P.3d 169 (internal citation omitted); *Hinkle v. Shepard Sch. Dist.*, 2004 MT 175, ¶¶ 35-38, 322 Mont. 80, 93 P.3d 1239 (internal citation omitted); *Henricksen v. State*, 2004 MT 20, ¶ 70, 319 Mont. 307, 84 P.3d 38 (internal citation omitted).

2012 MT 156, ¶¶ 40-43, 365 Mont. 405, 282 P.3d 687; *Azure v. City of Billings*, 182 Mont. 234, 256, 596 P.2d 460, 472 (1979). The pertinent question is whether, in context, the substantive essence of the stated opinion manifests or signifies a statement of reasonable probability or likelihood, supported by some rational basis, rather than a statement of speculative or conjectural possibility. *See Beehler*, ¶¶ 35-39 (exclusion of expert medical opinion referring to potential sources of medical causation in terms of "most likely," "more likely than not," and "unlikely" as insufficient to satisfy Rule 702 more probable than not standard was an abuse of discretion—citing *Ford*, ¶ 42); *Ford* ¶ 42 ("probative force of the opinion is not to be defeated by semantics if it is reasonably apparent that the [medical expert] intend[ed] to signify a probability supported by some rational basis"—internal punctuation and citations omitted); *Azure*, 182 Mont. at 256, 596 P.2d at 472 ("the context and circumstances of the testimony [is] [w]hat is important, and not the mere form of the answer"—citation omitted).[26]

### 3. OB/GYN Standard of Care Opinions – Dr. Harlass.

¶22 Dr. Harlass's Rule 26(b)(4) disclosure indicates that he is a retired OB/GYN, double board-certified in obstetrics-gynecology and maternal-fetal medicine, a prior "teacher of both physicians and nurses in the care and treatment of patients such as Ms. Kipfinger for

---

[26] Similarly, expert medical opinion that a specified occurrence, conduct, or mechanism of injury, disease, or other medical condition could, may, or might have possibly caused or contributed to, or is the suspected or assumed cause or contributing cause of, the injury, disease, or medical condition at issue is neither competent nor relevant proof of causation of that matter. *See Vernes*, ¶¶ 15-19; *Hinkle*, ¶¶ 35-38; *Butler*, ¶¶ 13-15; *Nelson v. Mont. Power Co.*, 256 Mont. 409, 412, 847 P.2d 284, 286 (1993).

many years,"[27] and has "personally treated hundreds of patients just like Ms. Kipfinger over 36 years." He further testified at deposition that his focus as a "maternal fetal medicine specialist" is "on high-risk deliveries" and that, as a double board-certified OB/GYN and maternal-fetal medicine specialist, he has prior experience in "manag[ing] the labor and delivery process of . . . high-risk patients all the way through." The primary issue in this case is whether the opinions stated in Dr. Harlass's Rule 26(b)(4) disclosure report and supplemental deposition testimony are minimally sufficient under M. R. Evid. 702 to establish a genuine issue of material fact on the standard of care and breach elements of the essence of Kipfinger's medical malpractice claim against Dr. Kuykendall.

¶23    Dr. Harlass's Rule 26(b)(4) expert disclosure report states that, "by virtue of [his] education, training, and board certification[s]" as an OB/GYN and maternal-fetal medicine specialist, he is "familiar with the standard of care for . . . physicians . . . taking care of patients" like Kipfinger, and is "familiar with the degree of skill and learning ordinarily possessed and used by" such "physicians . . . in good standing throughout the United States." Under examination by Dr. Kuykendall's counsel at deposition, Dr. Harlass again asserted that the standard of care applicable to board-certified OB/GYNs is a "national standard of care."[28] As to the degree of certainty to which he rendered opinions not phrased

---

[27] Dr. Harlass's curriculum vitae included in his Rule 26(b)(4) disclosure lists that, prior to engaging in private practice from 2001 into 2017, he was employed in various professorial capacities at Texas Tech University School of Medicine OB/GYN Department from 1996 into 2001.

[28] Harlass Depo. at 52:19-25, 53:11-16, 53:25, and 54:1-2 (noting that his criticisms of Dr. Kuykendall pertain to the national standards of care applicable to board-certified OB/GYNs).

in terms of speculation, conjecture, or mere possibility, Dr. Harlass acknowledged that he was "answering truthfully to the best of [his] ability *to a reasonable degree of medical probability*."[29] He further acknowledged at deposition that, "[w]ith regard to obstetrical care, the only opinion [he was] offering [in his report] is exclusively related to . . . Dr. Kuykendall."[30] Consequently, viewed in the light most favorable to the non-moving party and except as otherwise stated in less certain terms, Dr. Harlass rendered his pertinent criticisms of the obstetric care provided by Dr. Kuykendall based on his opinion as to the applicable national standard of care for board-certified OB/GYNs to a reasonable degree of medical probability.

(A) <u>Initial Standard of Care Breach:  Erroneous EFM Tracings Interpretation</u>.

¶24 Underlying or related to all of his other, more specific breach of standard of care opinions, Dr. Harlass asserted in his Rule 26(b)(4) report that Dr. Kuykendall "misinterpreted" E.C.'s prepartum FHR tracings regarding manifest indications of "repetitive late decelerations, decreased variability, a rising baseline[,] and notable tachycardia." The Rule 26(b)(4) report then identified various asserted "deviations from the standard of care" which Dr. Harlass attributed to the asserted misinterpretations of E.C.'s EFM tracings.

---

[29] Harlass Depo. at 10 (emphasis added).

[30] Harlass Depo. at 51:5-13, 51:21-52:1, and 52:8-10 (acknowledging Dr. Kuykendall was the subject of his criticisms).

(B)    ACOG Three-Tiered Fetal Heart Rate Classification and Management Scheme and Related Terminology.

¶25    In 2009, based on the 2008 recommendations of the National Institute of Child Health and Human Development (NIHHD) and the Society for Maternal-Fetal Medicine, the American College of Obstetricians and Gynecologists (ACOG) published guidelines "review[ing] nomenclature for fetal heart rate assessment" and "describ[ing] a [three-tiered] system for EFM classification."[31]  In 2010, ACOG followed up with related guidelines intended to "provide obstetric care providers a framework for evaluation and management of intrapartum EFM patterns based on the new three-tiered categorization."[32] In both cases, ACOG prefaced both sets of guidelines with the following qualifications:

> Th[is] information is designed to aid practitioners in making decisions about appropriate obstetric and gynecologic care.  These guidelines *should not* be construed *as dictating an exclusive course of treatment or procedure. Variations* in practice *may be warranted* based on the needs of the individual patient, resources, and limitations unique to the institution or type of practice.[[33]]

---

[31] See ACOG Practice Bulletin No. 106 at 1-2, and *Management of Intrapartum Fetal Heart Rate Tracings*, ACOG Practice Bulletin No. 116, Nov. 5, 2010, at 1232.  Distinct from ACOG Practice Bulletin No. 106 (Harlass Depo. Ex. 49), the Harlass deposition record separately lists Exhibit 47 (in re definitions of ACOG Categories I-III) and Exhibit 48 (ACOG Bulletin "[r]eferred to by Dr. Harlass").  The Harlass deposition also includes a discussion between Dr. Kuykendall's counsel and Dr. Harlass regarding the ACOG "algorithm" for assessing "nonreassuring tracings." Harlass Depo. at 45-46.  See ACOG Practice Bulletin No. 116 at 1235 (setting forth and discussing ACOG "[m]anagement algorithm of intrapartum [FHR] tracings based on three-tiered category system").

[32] ACOG Practice Bulletin No. 116 at 1232.

[33] ACOG Practice Bulletin Nos. 106 at 1 and 116 at 1232 (emphasis added).

¶26    The ACOG "Fetal Heart Rate Interpretation System" includes three distinct FHR

classifications with corresponding assessment criteria and explanatory terminology:

> Category I:   Category I tracings "are normal" and "not associated with fetal acidemia."[34]  "Category I tracings reflect a lack of fetal acidosis and do not require intervention."[35]  They "may be managed in a routine manner with either continuous or intermittent monitoring."[36]  "Change in management may" be warranted "only if Category II or Category III features develop."[37]
>
> Category II:  Category II "tracings include all FHR patterns that are not classified as Category I or Category III," but nonetheless "require evaluation, continued surveillance, initiation of appropriate corrective measures when indicated, and reevaluation."[38]   "Once identified, these tracings may require more frequent evaluation, documentation, and continued surveillance, unless they revert to Category I."[39]
>
> Category II tracings:  (1) "are indeterminate"; (2) "not predictive of abnormal fetal acid-base status" absent "adequate evidence to classify" as either Category I or Category III tracings; and (3) "require evaluation and continued surveillance and reevaluation" based on "the entire associated clinical circumstances."[40]  Category II tracings "can encompass monitoring predictive of clinically normal to rapidly developing acidosis."[41]  "Category II tracing abnormalities can be addressed by

---

[34] ACOG Practice Bulletin No. 116 at 1232.

[35] *Intrapartum Fetal Monitoring*, *supra* note 2, at 158.

[36] ACOG Practice Bulletin No. 116 at 1232 and 1234.

[37] *Id.* at 1234.

[38] *Id*.

[39] *Id*.

[40] ACOG Practice Bulletin No. 106 at 2.  See similarly Harlass Depo. at 150, 214, 257, and 265-70 (referring to ACOG Practice Bulletin No. 106 in re NIHHD three-tiered FHR classification system).

[41] *Intrapartum Fetal Monitoring*, *supra* note 2, at 158.

28

treating reversible causes and providing intrauterine resuscitation" including, *inter alia*, "stopping uterine-stimulating agents."[42]

Category III: Category III tracings are "abnormal and convey[] an increased risk for fetal acidemia at the time of observation."[43] "Category III tracings have been associated with an increased risk for neonatal encephalopathy, cerebral palsy, and neonatal acidosis."[44] "If unresolved, Category III FHR tracings most often require prompt delivery."[45]

Various "intrauterine resuscitation measures" may be used in Category III, but "potential interventions for intrauterine resuscitation should be modified to the appropriate clinical circumstance(s) and specific FHR pattern" at issue.[46] "Continued minimal variability . . . that cannot be explained or resolved with [intrauterine] resuscitation should be considered as potentially indicative of fetal acidemia and should be managed accordingly."[47] If "FHR does not improve," "preparations . . . and a time frame for proceeding to delivery should be determined."[48]

Under the ACOG classification system, "tracing patterns provide information only on the current acid-base status of the fetus" which may fluctuate over time.[49] Pertinent terminology frequently used throughout Dr. Harlass's Rule 26(b)(4) report and

---

[42] *Id.*

[43] ACOG Practice Bulletin No. 116 at 1237.

[44] *Id.*

[45] *Id.* See similarly *Intrapartum Fetal Monitoring*, *supra* note 2, at 158 ("Category III tracings are highly concerning for fetal acidosis, and delivery should be expedited if immediate interventions do not improve the tracing").

[46] ACOG Practice Bulletin No. 116 at 1237.

[47] *Id.*

[48] *Id.*

[49] ACOG Practice Bulletin No. 106 at 2.

supplemental deposition testimony regarding Category II and Category III FHR tracings

include, *inter alia*:

> Non-reassuring fetal status: a term describing "suspected fetal hypoxia" and "meant to replace the more ubiquitous term 'fetal distress.' Fetal distress, defined as progressive fetal hypoxia and/or acidemia secondary to inadequate fetal oxygenation, is a term that is used to indicate changes in fetal heart patterns, reduced fetal movement, fetal growth restriction, and presence of meconium stained fluid. . . . Non-reassuring fetal status is not an adverse event per se, but rather an indicator of an underlying condition resulting in temporary or permanent oxygen deprivation to the fetus which may lead to fetal hypoxia and metabolic acidosis."[50]

> Baseline FHR: the "mean FHR rounded to increments of 5 beats per minute during a 10-minute segment" (excluding "periodic or episodic changes," "periods of marked FHR variability," and "segments . . . that differ by more than 25 beats per minute").[51] The baseline for a particular "time period is indeterminate" unless it continues "for a minimum of 2 minutes in any 10-minute segment."[52] "Normal FHR baseline" is "110-160 beats per minute."[53]

> Deceleration: the "visually apparent usually symmetrical gradual decrease and return of the fetal heart rate associated with a uterine contraction."[54] "A gradual decrease is defined as from the onset to the FHR nadir of 30 seconds or more," and "is calculated from the onset to the nadir of the deceleration" which "occurs at the same time as the peak of the contraction."[55]

---

[50] Courtney Gravett, et al., *Reassuring Fetal Status: Case Definition & Guidelines*, 34 Vaccine 6084, 6084, Dec. 2016, https://www.sciencedirect.com/science/article/pii/S0264410X16300263?via%D ihub.

[51] ACOG Practice Bulletin No. 106 at 3.

[52] *Id.*

[53] *Id.*

[54] *Id.* (defining "early deceleration").

[55] *Id.*

Recurrent variable decelerations: decelerations "occurring with greater than or equal to 50% of contractions."[56]

Late deceleration: a deceleration that "is delayed in timing, with the nadir of the deceleration occurring *after* the peak of the contraction."[57]

FHR variability: "[f]luctuations in the baseline FHR that are irregular in amplitude and frequency" and which are "visually quantitated as the amplitude of peak-to-trough in beats per minute."[58]
- *Absent Variability*: amplitude range undetectable.
- *Minimal Variability*: amplitude range is detectable at 5 beats per minute or less.
- *Moderate/Normal Variability*: amplitude range 6-25 beats per minute.
- *Marked Variability*: amplitude range greater than 25 beats per minute.

Fetal tachycardia: "baseline heart rate greater than 160 beats per minute (bpm) for at least 10 minutes."[59] Tachycardia "is considered a nonreassuring [FHR] pattern."[60] Causes of fetal tachycardia include fetal hypoxia, *inter alia*.[61] "In isolation, tachycardia is poorly predictive for fetal hypoxemia or acidemia, unless accompanied by minimal or absent FHR variability or recurrent decelerations or both."[62]

(C) Category II FHR Abnormalities, Initiation of Pitocin, and Failure to Use Fetal Scalp EFM in re Earlier Discovery of Meconium.

---

[56] ACOG Practice Bulletin No. 116 at 1234.

[57] ACOG Practice Bulletin No. 106 at 3 (emphasis added).

[58] *Id*.

[59] ACOG Practice Bulletin No. 116 at 1235.

[60] Amir Sweha, MD, Trevor W. Hacker, MD, and Jim Nuovo, M.D., *Interpretation of the Electronic Fetal Heart Rate During Labor*, 59(9) Am Fam Physician, 2487-2500, May 1, 1999, https://www.aafp.org/pubs/afp/issues/1999/0501/p2487.html (emphasis added).

[61] *Id*.

[62] ACOG Practice Bulletin No. 116 at 1236.

¶27    Based on his review of E.C.'s FHR tracings and corresponding nursing notes, Dr. Harlass testified at deposition that E.C. transitioned from ACOG Category I to Category II in the period from 3:50 to 4:30 a.m., as indicated by multiple "late decelerations"/"lates," "intermittent lates," "prolonged, decreased variability," "minimal" variability, and rise in FHR "baseline."[63]  He testified that E.C. remained in Category II with fluctuating FHR conditions from 5:47 a.m. through 1:41 p.m. when oxytocin administration began in accordance with Dr. Kuykendall's "orders."[64]  He testified further that, as of 1:41 p.m., E.C.'s tracings had already manifested "fetal tachycardia," "decreased variability," and "intermittent lates," and that oxytocin "should not have been started" in Category II "with this tracing."[65]  Dr. Harlass thus testified that the initiation of oxytocin at 1:41 p.m. under those Category II circumstances was a "departure from the standard of care."[66]  *See similarly* Harlass Rule 26(b)(4) report (asserting nurse initiation and physician

---

[63] Harlass Depo. at 88-89, 91-94, 95-98, and 103.  See also ACOG Practice Bulletin No. 116 at 1234 (while not necessarily "predictive" of abnormal fetal acid-base status, Category II may include a "diverse spectrum of abnormal FHR patterns" such as tachycardia, minimal baseline variability, recurrent variable decelerations with minimal or moderate baseline variability, recurrent late decelerations with moderate baseline variability, or "variable decelerations with other characteristics").

[64] Harlass Depo. at 107-14, 163, and 249.

[65] Harlass Depo. at 116-17 and 163.

[66] Harlass Depo. at 122 and 163-65.

ordering of oxytocin in the presence of a Category II[67] tracing as one of several "deviations from the standard of care").[68]

¶28    As to the failure to use a fetal scalp lead and internal EFM, and related failure to earlier discover the presence of meconium in E.C.'s amniotic fluid, Dr. Harlass stated in his Rule 26(b)(4) report that the "physician failed to apply a fetal scalp lead monitor in the presence of [FHR] abnormalities"—"[t]he meconium would have been diagnosed at this point in time." He further testified at deposition that:

(1)    Dr. Kuykendall did not notice and diagnose the presence of meconium in E.C.'s amniotic fluid until rupture of the placental membranes during the C-Section procedure;[69]

(2)    she "absolutely" could have noticed and "addressed [the meconium] earlier" if she had ordered placement of a fetal scalp lead when E.C. was in a

---

[67] His report stated that "the physician" ordered Pitocin in the presence of a Category III tracing, but Dr. Harlass later clarified at deposition that the report reference to Category III tracing was a typographical error that should have referred to a Category II tracing. Harlass Depo. at 279.

[68] See also ACOG Practice Bulletin No. 116 at 1236-37 (Table 2 recommending "[d]iscontinue oxytocin" in presence of "[t]achysystole with Category II or III tracing"—management of "laboring women receiving oxytocin" in presence of *tachysystole* "involves efforts to reduce uterine activity to minimize risk of evolving fetal hypoxemia or acidemia"—in the midst of Category II or III tracing "oxytocin should be reduced or stopped in addition to intrauterine resuscitation"), and ACOG Series 1, *supra* note 12, at 12 and 16 ("discontinue oxytocin" in presence of "[t]achysystole with non-reassuring fetal heart rate pattern"—"terminate oxytocin infusion" in presence of "tachysystole," "precipitous labor," or "non-reassuring fetal heart rate pattern"—"[d]iscontinue the oxytocin" for "[u]terine tachysystole that does not respond to a decrease in oxytocin dose" and/or "[f]etal heart rate pattern demonstrating . . . [r]ecurrent late decelerations" or "recurrent variable decelerations with absent or minimal baseline variability," *inter alia*).

[69] Harlass Depo. at 158-59.

Category II state as indicated by manifestly "concerning" or "questionable" tracings;[70]

(3) "[f]etal scalp leads are indicated in tracings that are concerning or . . . questionable. [Kipfinger] had a cervix that was two centimeters dilated. It would have been easy to put on that . . . fetal scalp lead. And then you would have noted the meconium. . . . My opinion . . . is if the scalp lead was applied at the correct point in time when it was a Category II tracing[,] [it] would have clearly defined whether this was Category I or Category III. . . . [W]hen you're in Category II and you can put on a scalp lead safely, you would be well advised to, if you want to define what that tracing is";[71]

(4) E.C. "was born with meconium stained amniotic fluid" and "meconium on [his] skin";[72]

(5) meconium "g[ot] into" E.C.'s "lungs" and "the meconium in this baby was probably an intrapartum event";[73] and

(6) a scalp lead for internal EFM should have been applied in this case at the point "along the line" during that "several hours"-long Category II when the physician "knows the nurses have well documented concerns about that tracing."[74]

In his earlier Rule 26(b)(4) report, Dr. Harlass asserted that the physician's failure to apply a fetal scalp lead monitor "in the presence of [FHR] abnormalities," and thereby precluding earlier diagnosis of the presence of meconium, was one of several noted "deviations from

---

[70] Harlass Depo. at 159-62, 168, and 213 (responding *inter alia* to defense questions in reference to "a departure from the standard of care").

[71] Harlass Depo. at 159-62, 168, 213, and 245.

[72] Harlass Depo. at 241.

[73] Harlass Depo. at 241 and 244 (*inter alia* referencing in utero "open-glottis" breathing as indicative of a "hypoxic event").

[74] Harlass Depo. at 245-56.

the standard of care." Liberally construed and viewed in the light most favorable to the non-moving party, Dr. Harlass's Rule 26(b)(4) disclosure statements and pertinent deposition testimony were at least minimally sufficient to state qualified expert medical opinions, on a more probable than not or reasonable degree of medical certainty basis, that Dr. Kuykendall deviated from the national standard of care for board-certified OB/GYNs by: (1) failing to correctly interpret E.C.'s external FHR tracings; (2) ordering oxytocin administration at 1:41 p.m.; and (3) failing to timely employ a fetal scalp lead for internal EFM, and thus failing to earlier diagnose the presence of meconium and attendant risk of meconium aspiration.

(D) Category III Transition: Failure to Timely Cease Pitocin Administration and Timely Order C-Section Procedure.

¶29 With reference to various ACOG terminology and criteria, Dr. Harlass testified at deposition that E.C.'s FHR tracings transitioned from ACOG Category II to Category III as of 3:20 p.m.[75] He based that conclusion on: (1) published ACOG indications of FHR distress; (2) his opinion, knowledge, and experience that repetitive late decelerations are usually indicative of Category III distress, particularly when accompanied by decreased/minimal variability and fetal tachycardia; (3) nurse documentation at 3:08 p.m. of E.C.'s abnormal tracing patterns (i.e., "heart tones," continued decreased variability, and late decelerations) and nurse notification of Dr. Kuykendall and request for her review of those noted abnormalities; (4) his opinion that E.C.'s FHR tracings strip indicated recurrent

_____

[75] Harlass Depo. at 121-22, 145-49, 151-54, and 186-88.

late decelerations, marked FHR tachycardia "up to 180" bpm, "markedly decreased" variability/"minimal variability," and "change in [E.C.'s] baseline [FHR] from 175 to 180"; and (5) his opinion that those tracings were indicative of "intrapartum hypoxia with possible asphyxia."[76]  Dr. Harlass testified that E.C.'s fetal tachycardia occurred as a result of "[r]epetitive recurrent bouts of hypoxia."[77]  He explained that late decelerations, decreasing variability, and increasing tachycardia indicated the associated risk of lactic acidosis (i.e., lactic acid accumulation) insofar that:

> it takes oxygen to burn carbohydrates, specifically glucose.  If you don't have oxygen to burn glucose, then lactic acid accumulates as the byproduct.[78]

¶30    Based on his Category III transition opinion, Dr. Harlass testified that oxytocin/Pitocin administration should have stopped and been discontinued at 3:20 p.m.[79] With reference to the various abnormalities indicated by E.C.'s FHR tracings "from about" 2:30 p.m. on, Dr. Harlass's Rule 26(b)(4) report asserted that oxytocin "should have been discontinued" at 3:15 p.m. "at the latest."  The report then later referred to that failure as one of the referenced "deviations from the standard of care."  His subsequent deposition

---

[76] Harlass Depo. at 121-24, 151-54, and 174.  Without specification of the referenced time periods, Dr. Harlass's Rule 26(b)(4) report also stated, *inter alia*, that "there are periods of no discernable tracing" in E.C.'s tracings.  See also ACOG Practice Bulletin No. 116 at 1234 (in contrast to various other abnormalities "associated with normal perinatal outcomes," recurrent variable decelerations "that progress to greater depth and longer duration are more indicative of impending fetal acidemia").

[77] Harlass Depo. at 253-54.

[78] Harlass Depo. at 175 and 177.

[79] Harlass Depo. at 122 and 166-67.

testimony clarified 3:20 p.m. as the time at which oxytocin/Pitocin administration should have been discontinued[80] and acknowledged that in "regard to obstetrical care," that his stated deposition opinions "exclusively related to . . . Dr. Kuykendall."[81] Similarly based on his Category III transition opinion, Dr. Harlass further testified that Dr. Kuykendall should have called the C-Section procedure at 3:20 p.m. due to the manifest "degeneration" of E.C.'s FHR tracings to Category III, and the additional fact that the attending nurse(s) had "already tried" various intrauterine "resuscitative measures," "[n]othing ha[d] worked," and the Category III tracings were thus "not correctable."[82] Instead, Dr. Kuykendall waited to call the C-Section until 4:10 p.m. after E.C.'s tracings showed continuing recurrent late decelerations, "marked tachycardia" increasing to 190 bpm, and "even worse" variability.[83] Liberally construed and viewed in the light most favorable to the non-moving party, Dr. Harlass's Rule 26(b)(4) disclosure statements and pertinent

---

[80] *Id.*

[81] Harlass Depo. at 51-52.

[82] Harlass Depo. at 185-87 and 240. See similarly ACOG Practice Bulletin No. 116 at 1235 (when recurrent late decelerations and minimal variability occur in Category II without accelerations, and "intrauterine resuscitation" efforts do not result in "adequate improvement in fetal status," "fetal acidemia should be considered and the potential need for expedited delivery should be evaluated"), 1236 (in re Category II tracing with "prolonged decelerations," FHR "variability during baseline periods should be evaluated in order to better assess the risk of fetal acidemia"—if "prolonged decelerations . . . do not resolve, then prompt delivery is recommended"), and 1237 ("unresolved[] Category III FHR tracings most often require prompt delivery"—"[w]hile intrauterine resuscitation measures are used, preparations for delivery should be considered and a time frame for proceeding to delivery should be determined if the FHR does not improve").

[83] Harlass Depo. at 125-26.

deposition testimony were at least minimally sufficient to state qualified expert medical opinions, on a more probable than not or reasonable degree of medical certainty basis, that Dr. Kuykendall deviated from the national standard of care for board-certified OB/GYNs by failing to timely discontinue oxytocin administration and order a C-Section procedure no later than 3:20 p.m.

    (E)   <u>Failure to Ensure Timely Availability of Medical Professional Capable of Immediate Neonatal Resuscitation of Distressed Newborn</u>.

¶31    Dr. Harlass testified at deposition that, at the point that Dr. Kuykendall ordered a C-Section due to E.C.'s degenerating Category III tracings, the procedure was a "high risk" procedure for which Benefis Hospital protocols contemplated the need for immediate "neonatal intubation," and called for the presence of a qualified medical professional capable of immediately intubating a distressed newborn in a skillful manner.[84]  No NICU team member was present at the start of Kipfinger's C-Section procedure and

---

[84] Harlass Depo. at 140 and 188-89.  When "called to attend the delivery or to take over resuscitation in an emergency," Benefis's "Neonatal Response Team Delivery Attendance" Treatment/Guideline called for the presence at the procedure of a specified contingent of its "Neonatal Response Team" (consisting of a neonatologist, neonatal nurse practitioner (NNP), NICU nurse (RN), and NICU respiratory therapist (RT), and which depended on the guideline-defined risk classification of the subject delivery (i.e., high-risk, moderate-risk, or low-risk)).  For "high-risk" deliveries, the guideline specified the presence of a neonatologist and/or NNP, a NICU RN, and a NICU RT, "one [of which] *with complete* resuscitation skills." (Emphasis original.)  Listed "high-risk" criteria *inter alia* included "[*f*]*etal compromise*, not responsive to interventions and consideration to deliver with . . . emergency" C-Section, "[m]econium *with* fetal compromise," or "[a]ny other delivery designated as high-risk after discussion between OB and Neonatologist," and "[i]f in doubt, always call Neonatology." (Emphasis original.)  Attending Benefis Nurse Carrie Etcheberry testified, *inter alia*, that it was ultimately the attending OB/GYN's decision as to whether and when to call for NICU team presence at a C-Section delivery.  See Etcheberry Depo. at 80-81.

Dr. Kuykendall did not call for a NICU team response until after making the initial uterine incision and seeing the presence of meconium in E.C.'s amniotic fluid before rupturing Kipfinger's placental membranes at 4:47 p.m.[85]  A responding NICU team member, a NICU respiratory therapist (RT), did not arrive in the operating room until 4:55 p.m., approximately 8 minutes after Dr. Kuykendall extracted and delivered the limp and non-responsive E.C.  An attending non-NICU CRNA, who was already present assisting Dr. Kuykendall with Kipfinger's anesthesia, stepped in to attempt intubation after the NICU RT was unsuccessful.  Another 5-6 minutes passed before the CRNA was able to successfully intubate E.C., thereby clearing/establishing an airway for him to breathe.  The limp and non-responsive newborn was thus without any airway for approximately 12-14 minutes.[86]  Viewed in the light most favorable to the non-moving party, Dr. Harlass's deposition testimony essentially asserted that it was ultimately Dr. Kuykendall's responsibility to ensure that a qualified NICU team member, whether a neonatologist or respiratory therapist (RT) capable of immediately intubating and resuscitating a distressed newborn, was present in the operating room on extraction.[87]  Similarly viewed in the light

---

[85] Viewed in the light most favorable to the non-moving party, a question of fact remains on the deposition testimonies of Dr. Kuykendall and attending Nurse Etcheberry as to whether Dr. Kuykendall answered "no" when another nurse asked her if she wanted NICU attendance at the starting of the C-Section procedure.  See Etcheberry Depo. at 79.

[86] Harlass Depo. at 141-42 and 192.  See also Harlass Depo. at 237 (in re subsequent arrival in operating room of the "head of RT").

[87] Harlass Depo. at 140-43 (asserting that a "neonatologist or [experienced] person that can skillfully . . . intubate this baby should have been there"—before "she called for that C-Section . . . on the merits of that tracing, she should have called for an – just a minute" (answer

most favorable to the non-moving party, Dr. Harlass's testimony further essentially asserted that Dr. Kuykendall's failure to ensure the presence of such medical professional in the operating room at the time of E.C.'s extraction was beneath the applicable standard of obstetric care under the circumstances of this case.[88]

¶32 The fact that Dr. Harlass referred to Benefis's NICU team protocols for high-risk, unscheduled C-Section deliveries in explaining his NICU team attendance opinions[89] does not, in context, render those opinions outside or inapplicable to the national standard of obstetric care under similar circumstances. Viewed in the light most favorable to the

_____

interrupted by Dr. Kuykendall's counsel)), and 51:5-13, 51:21-52:1, and 52:8-10 (acknowledging that Dr. Kuykendall was the subject of Harlass criticisms). See similarly Harlass Rule 26(b)(4) Report ("[it] was both Dr. Kuykendall's and the nurses [sic] responsibility to ensure appropriate [NICU team] attendance at delivery").

[88] Harlass Depo. at 140-43 (asserting that a "neonatologist or [experienced] person that can skillfully . . . intubate this baby should have been there"—before "she called for that C-Section . . . on the merits of that tracing, she should have called for an – just a minute" (answer interrupted by Dr. Kuykendall's counsel)); Harlass Rule 26(b)(4) Report (Harlass familiarity with standard of care for physicians "taking care of patients like Ms. Kipfinger" and "with the degree of skill and learning ordinarily possessed and used by" such physicians "throughout the United States"—referring to report criticisms as "deviations from the standard of care"—"[i]t was both Dr. Kuykendall's and the nurses [sic] responsibility to ensure appropriate [NICU team] attendance at delivery"); Harlass Depo. at 51:5-13, 51:21-52:1, and 52:8-10 (acknowledging Dr. Kuykendall was the subject of his criticisms), and 52:19-25, 53:11-16, 53:25, and 54:1-2 (noting that Dr. Kuykendall criticisms are stated in regard to national standard of care applicable to board-certified OB/GYNs).

[89] Harlass Depo. at 139-41 and Rule 26(b)(4) Report ("hospital failed to follow its own policy" and "[i]t was both Dr. Kuykendall's and the nurses [sic] responsibility to ensure appropriate [NICU team] attendance at delivery"). See also Harlass Depo. at 218 and 221 (acknowledging that he and Dr. Kuykendall's counsel "have discussed each and every criticism" he has "of Dr. Kuykendall," "each and every opinion that" he has that she "departed from the standard of care," and "the entirety of the opinions" he has "that are critical of Dr. Kuykendall or where [he] believe[s] that she departed from the standard of care").

non-moving party, and in contrast to an isolated assertion without supporting expert testimony that the Benefis NICU team policy or protocol itself constituted the standard of care applicable to Dr. Kuykendall, *cf., e.g.*, *Dalton v. Kalispell Reg'l Hosp.*, 256 Mont. 243, 246-47, 846 P.2d 960, 962 (1993) (evidence of violation of internal hospital policy insufficient alone to establish standard of care or breach of standard of care absent qualified expert testimony that the policy violation breached the applicable standard of care), Dr. Harlass stated his Rule 26(b)(4) report and supplemental deposition testimony opinions as a national board-certified OB/GYN and maternal-fetal care specialist, in the context of and based on his expressly asserted familiarity with the standard of care applicable to similarly board-certified OB/GYN physicians.[90]

¶33    Dr. Kuykendall correctly points out that Dr. Harlass acknowledged he did not know of any national standard of obstetric care that required the presence of a *neonatologist, rather than a NICU RT*, at an unscheduled high-risk C-Section procedure, and was similarly unfamiliar with the national standard of *neonatology care for resuscitation* of a non-responsive meconium-covered newborn.[91]  However, contrary to the similar assertions of the District Court and Dr. Kuykendall, Dr. Harlass's admitted lack of knowledge regarding those particular matters had no bearing whatsoever on his assertion that

[90] See similarly ACOG Practice Bulletin No. 116 at 1238 ("[p]reparation for impending delivery . . . with a Category III tracing often requires assessment of several logistical issues depending on the setting and clinical circumstances"—"potential logistical considerations in preparation for operative delivery in setting of Category III tracing" include, *inter alia*, "assembl[y] [of] personnel for neonatal resuscitation"—capitalization altered).

[91] Harlass Depo. at 189-90 and 238.

Dr. Kuykendall breached the national standard of obstetric care by failing to ensure that a qualified NICU team member, *whether a neonatologist or NICU RT*, was present in the operating room to timely intubate and resuscitate E.C. as need be on extraction in a high-risk unscheduled C-Section delivery. He clarified at deposition that his focus was on the extended period of oxygen deprivation caused by the initial absence and late arrival of *any* NICU team member, whether a neonatologist or RT, at the time of extraction of E.C., and additional delay before he was successfully intubated and resuscitated.[92] The undisputed fact that an attending non-NICU nurse anesthetist, who was present at the C-Section to assist with Kipfinger's anesthesia, was ultimately able to successfully intubate E.C. similarly does not disqualify or refute Dr. Harlass's opinion that Dr. Kuykendall breached the applicable standard of obstetric care by failing to ensure the presence of a qualified *NICU team member*, whether a neonatologist or NICU RT, capable of intubating and fully resuscitating a non-responsive newborn under the circumstances at issue.

    4. <u>Kipfinger's Alleged Change of Factual Theory on Appeal</u>.

¶34    Following the lead of the District Court's criticism of Kipfinger's limited, "unimpressive," and unhelpful briefing in opposition to Dr. Kuykendall's motion for summary judgment,[93] Dr. Kuykendall asserts on appeal that, by now citing to pertinent

---

[92] Harlass Depo. at 140-41 and 237 (asserting that a "neonatologist or [experienced] person that can skillfully . . . intubate this baby should have been there" and was not, RT did not "show[] up" "until eight minutes later," newborn not successfully intubated by the anesthetist until additional "five . . . six . . . or seven" minutes passed, and resulting delay in intubation was "significant" and "very critical to this baby").

[93] Order on Defendants' Motion for Summary Judgment, No. ADV-17-699(b), p. 6 n.1 (Sept. 27, 2021).

portions of the complete Harlass deposition testimony, rather than just the factual assertions in the Harlass Rule 26(b)(4) report and 8-page deposition excerpt attached to Kipfinger's brief in opposition, Kipfinger is now improperly shifting her factual theory based on "testimony not relied upon in district court." Dr. Kuykendall thus asserts that we should either reject Kipfinger's new factual arguments or consider them "for purposes of context only" in regard to the deficiencies in Kipfinger's briefing noted by the District Court. Citing *Pilgeram v. GreenPoint Mort. Funding, Inc.*, 2013 MT 354, ¶¶ 20-24, 373 Mont. 1, 313 P.3d 839, Dr. Kuykendall asserts that, rather than review the entirety of the Harlass deposition as asserted by Kipfinger on appeal, we must limit our review to "the district court's determinations about Dr. Harlass's opinions" and the court's "conclusions flowing therefrom."

¶35 In *Pilgeram*, we considered whether the *moving* party who obtained summary judgment in district court could properly raise a new alternative legal theory, not asserted or considered in district court, based on the existing Rule 56 factual record in defense of the summary judgment on appeal. *See Pilgeram*, ¶¶ 19-27 (considering whether commercial lender could properly raise a special agency theory to defend summary judgment on appeal in anticipation of failure of the rationale upon which the court granted summary judgment to the lender on a residential mortgage foreclosure claim). In addressing the issue, we first noted the longstanding principle that we generally will not consider "new arguments or legal theories [raised] for the first time on appeal," because "[i]t is fundamentally unfair for a party to withhold an argument" below, gamble "on a

favorable outcome" on the party's chosen legal theory, "and then assert a separate legal theory" in the event the chosen strategy may later fail on appeal. *Pilgeram*, ¶¶ 20-21. As a narrow exception to the general rule, we recognized that we may review a different legal theory on the same factual record on appeal "if extenuating circumstances justify the party's failure to assert" the different "legal theory" below. *Pilgeram*, ¶ 21 (noting "the emergence of new precedent on the issue" for example). We ultimately held, however, that no extenuating circumstances justified consideration of the new agency theory on appeal in *Pilgeram* because: (1) the moving party did not mention, much less raise, the new agency theory in any of their "[complaint] answers" or "motions for summary judgment"; (2) the existing Rule 56 factual record was insufficient to satisfy the requisite elements of the new agency theory in any event; (3) review of the new theory on appeal would prejudicially deny the non-moving party the Rule 56 right to present contrary evidence to demonstrate a genuine issue of material fact precluding summary judgment; and (4) a genuine issue of material fact nonetheless remained even if the existing record was, *arguendo*, sufficient *prima facie* to satisfy the new agency theory. *See Pilgeram*, ¶¶ 22-27.

¶36    As a preliminary matter, summary judgment is proper only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). The question of whether a genuine issue of material fact remains on the Rule 56 factual record is a question of law generally subject to de novo

review on appeal. In that context, several factors distinguish the circumstances of this case from those at issue in *Pilgeram*. First, unlike in *Pilgeram*, Dr. Kuykendall, not Kipfinger, is the moving party who has the burden of demonstrating the complete absence of any genuine issue of material fact.

¶37 Second, in regard to the applicable standard of obstetric care, Dr. Kuykendall's motion and supporting brief for summary judgment narrowly focused on Kipfinger's singular complaint assertion that Dr. Kuykendall breached the standard of care "by starting Kipfinger's C-Section without ensuring a resuscitation team capable of intubating E.C. was ready." Then, with focus on isolated allegations in Kipfinger's amended complaint, Dr. Kuykendall narrowly asserted that Kipfinger could not establish that singular alleged departure from the standard of care because "Plaintiff's concede the need for an intubation team was *not* apparent until *after* [E.C.] was delivered" and that "a provider capable of intubating [him]—the provider who did, in fact, intubate [him]—was present the entire time." However, though narrowly stated under Count VI of Kipfinger's amended complaint, Kipfinger's asserted malpractice claim against Dr. Kuykendall incorporated by reference a large number of other factual averments pertinent to Dr. Kuykendall, not to mention the yet broader scope of the pertinent expert opinion testimony encompassed in Dr. Harlass's Rule 26(b)(4) report and supplemental deposition testimony.[94] Even viewed in isolation, the complaint paragraphs (¶¶ 49-50 and 69) asserted by Dr. Kuykendall as

---

[94] See, e.g., Amended Complaint, DC 18 at ¶¶ 15-17, 22-25, 27, 30-37, and 77-81.

*concessions* in her initial support brief cannot be reasonably construed, when viewed in context in the light most favorable to the non-moving party, as admissions or concessions contradicting or qualifying even the narrow medical malpractice claim pled. As to the broader scope of medical malpractice asserted in Dr. Harlass's Rule 26(b)(4) report and supplemental deposition testimony, Dr. Kuykendall does not challenge the District Court's reasoning that, though Kipfinger had yet to seek leave for formal amendment of her narrower originally-pled claim against Dr. Kuykendall, the Rule 26(b)(4) Harlass report set forth "additional allegations, about which" Dr. Kuykendall and co-defendant GFOGA had "full opportunity to inquire," did in fact "fully explore[]," and which the court thus "treat[ed] . . . as amendments to the complaint." Unlike in *Pilgeram*, the limited scope of Kipfinger's defensive arguments *in opposition* to Dr. Kuykendall's motion for summary judgment were not the result of a calculated choice upon which she narrowly elected to gamble in district court. Rather, they were merely responsive to the narrow arguments asserted by the moving party in her initial brief in support of her motion for summary judgment.

¶38 Third, Dr. Kuykendall asserts that we should not consider the entirety of the Harlass deposition testimony, beyond the 8-page excerpt attached to Kipfinger's opposition brief below, as referenced by Kipfinger on appeal for any purpose other than as contextual explanation for the stated reasons why the District Court found Kipfinger's narrow opposition briefing insufficient to preclude summary judgment below. At the same time, Dr. Kuykendall conveniently "take[s] no position concerning whether the district court

should or should not have sua sponte considered the remainder of Dr. Harlass's deposition transcript" in support of its grant of summary judgment to her. However, the District Court's statement that it "combed [the] expert depositions and disclosures filed by [Kipfinger],"[95] and its stated rationale and accompanying citation into the balance of the Harlass deposition, manifestly bely Dr. Kuykendall's hair-splitting on appeal and clearly evince that it considered the entirety of the Harlass deposition on the merits in granting summary judgment in favor of Dr. Kuykendall.[96]

¶39 Fourth, the District Court granted summary judgment to Dr. Kuykendall on the standard of care and breach elements of Kipfinger's claim based on grounds not raised, argued, or even mentioned *by Dr. Kuykendall* in her summary judgment motion and initial supporting brief. In a two-paragraph section of her support brief, Dr. Kuykendall initially asserted only that she was entitled to summary judgment on the standard of care and breach elements of Kipfinger's malpractice claim based on two asserted *concessions* in Kipfinger's complaint averments, without reference to Dr. Harlass's Rule 26(b)(4) report and supplemental deposition testimony. In her reply brief, however, Dr. Kuykendall raised for the first time a multitude of evidentiary arguments, with multiple citations into the

---

[95] Dr. Kuykendall makes no assertion that the remainder of the Harlass deposition was not "filed" as referenced in M. R. Civ. P. 56(c)(3), albeit belatedly, for purposes of summary judgment under the unique circumstances of this case. Further undermining her *Pilgeram*-based argument on appeal, nor did she oppose Kipfinger's uncontested motion on appeal for leave to supplement the appellate record to include the complete Harlass deposition transcript as "considered by the [District Court] to ensure Appellants were treated fairly" below.

[96] Whether the District Court correctly apprehended the effect of the entirety of Dr. Harlass's pertinent deposition testimony is, of course, another matter.

balance of the then-unfiled Harlass deposition purporting to demonstrate, *inter alia*, the lack of any genuine issue of material fact regarding the standard of care and breach elements of Kipfinger's malpractice claim.[97] Without affording Kipfinger an opportunity to respond, the District Court then granted summary judgment to Dr. Kuykendall on the standard of care and breach elements of Kipfinger's claim based on various cited evidentiary deficiencies and related legal arguments not mentioned, or even implicated, in the narrow scope of Dr. Kuykendall's initial support brief—all of which Dr. Kuykendall raised for the first time in her reply brief.

¶40     Prompted by Kipfinger's imprecise and, in some regards overbroad, opposition briefing, and Dr. Kuykendall's expanded reply-brief assertions, the District Court sua sponte requested and considered the entirety of the six-plus hour Harlass deposition testimony—all after this matter was fully submitted for decision on the briefs. These extraordinary procedural circumstances manifest the extenuating unfairness that would now result if the *non-moving party* is now precluded from asserting responsive evidentiary arguments on appeal *based* on the entirety of the Rule 56 record first-implicated in Dr. Kuykendall's reply brief, and upon which the District Court in fact granted summary judgment. *See Tags Realty, LLC v. Runkle*, 2015 MT 166, ¶ 10, 379 Mont. 416, 352 P.3d 616 (court "should not have granted summary judgment" on ground not raised by moving

---

[97] Interestingly, even Dr. Kuykendall's initial support brief cites into the balance of the then-unfiled Harlass deposition in regard to her asserted entitlement to summary judgment on the causation element of Kipfinger's claim.

party without affording non-moving party notice and opportunity to demonstrate genuine issue of material fact precluding summary judgment on that ground—citations omitted); *WLW Realty Partners, LLC v. Cont'l Partners VIII, LLC*, 2015 MT 312, ¶ 20, 381 Mont. 333, 360 P.3d 1112 (fairness dictates that district courts generally not grant summary judgment to the moving party based on legal or evidentiary arguments raised for the first time in a reply brief—citing *Worledge v. Riverstone Residential Grp., LLC*, 2015 MT 142, ¶¶ 16-18, 379 Mont. 265, 350 P.3d 39 (citing various authority from other jurisdictions)). *Pilgeram* is thus clearly distinguishable from the extraordinary circumstances at issue here and does not preclude appellate review based on the entirety of the Rule 56 factual record considered by the District Court in granting summary judgment to Dr. Kuykendall.

¶41     In assessing the state of the Rule 56 factual record and what reasonable inferences must be drawn in favor of the non-moving party, "the court must consider the entire record," not just the selected portions pointed out by the parties. *See Jarvenpaa*, 271 Mont. at 480, 898 P.2d at 692 ("court must consider the entire [Rule 56] record"—citing *Smith*, 242 Mont. at 40, 788 P.2d at 326). While we acknowledge the significant burden thrust upon the District Court by the often cursory and selective briefing of *both* parties in this highly-technical fact-intensive case, courts must be mindful of the drastic consequence of summary judgment and the resulting need for careful review of the entirety of the Rule 56 factual record. *See Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶¶ 57-58, 351 Mont. 464, 215 P.3d 649 (district courts "must be mindful of the fundamental purpose of discovery" to "promote ascertainment of truth and the ultimate disposition of the lawsuit in accordance

49

therewith" and not let the difficulty posed by the "unduly confusing" motion practice of counsel "result[] in substantial injustice to" the client—internal punctuation omitted). The District Court recognized as much in its judgment when it stated:

> The law favors resolution of disputes in a jury trial, and Montana's Constitution makes the right to jury trial and access to the Court fundamental rights. It is not appropriate or fair to completely erase a claim for a devastating injury because a motion was wholly improperly briefed. The law favors resolution of disputes on the merits.

(Internal citations omitted.) *See similarly* M. R. Civ. P. 1 and 56 (in re purpose of M. R. Civ. P. and applicable Rule 56 standards). Thus, as manifest in the foregoing analysis, we hold that genuine issues of material fact precluded the grant of summary judgment to Dr. Kuykendall on the standard of care and breach elements of Kipfinger's multi-faceted medical malpractice claim, as stated in her amended complaint and elaborated in the pertinent expert opinion testimony encompassed within Dr. Harlass's Rule 26(b)(4) report, supplemental deposition testimony, and referenced materials. Whether Kipfinger's proffered evidence is ultimately sufficient to satisfy those elements of her claim in the face of Dr. Kuykendall's contrary evidence is a matter for determination by the trier of fact on the merits at trial.

5. Causation Element of Kipfinger-Kuykendall Medical Malpractice Claim.

¶42 Dr. Kuykendall's Rule 56 motion also sought summary judgment on the causation element of Kipfinger's medical malpractice claim on the asserted grounds that:

(1) Kipfinger effectively "conceded [that] the element of causation cannot be proved" based on her isolated amended complaint averments, as characterized by Dr. Kuykendall, that a NICU "resuscitation team was [in any event] unavailable" for her C-Section procedure and that a "Benefis

50

provider capable of intubating" E.C., albeit a non-NICU CRNA who was present to assist with Kipfinger's anesthesia, did in fact eventually intubate E.C.;

(2)     the testimony of Kipfinger's "own neonatology expert" (neonatologist Dr. Steven A. Ringer, MD) proves that Dr. Kuykendall's alleged negligence "did not cause [E.C.] to suffer hypoxic-ischemic injury" either "intrapartum" or "postpartum"; and

(3)     Dr. Harlass is not qualified to opine that Dr. Kuykendall's alleged negligence caused E.C. to develop HIE because his obstetric and maternal-fetal care practice "does not . . . include diagnosing [HIE]" and his Rule 26(b)(4) report and supplemental deposition testimony in any event do not include any assertion, on a more probable than not basis, that E.C. "suffered *intrapartum* hypoxic-ischemic injury."

(Emphasis added.)   Reasoning that it was "unnecessary" because Kipfinger had "not established a standard of care" or "departure from the standard of care," the District Court did not rule on Dr. Kuykendall's accompanying motion for summary judgment on the causation element of the claim.

¶43     However, as noted *supra*, the District Court erroneously concluded that Dr. Kuykendall was entitled to summary judgment on the standard of care and breach elements of Kipfinger's claim.  Moreover, Dr. Kuykendall's included motion for summary judgment on causation was fully submitted below on her assertion that no genuine issue of material fact remained, and that she was thus entitled to judgment on causation as a matter of law.  Rule 56 review of that asserted issue of law is the same here as in district court: de novo review for compliance with applicable M. R. Civ. P. 56 standards based on the entire Rule 56 record.  Under these circumstances, we thus have discretion under our de novo standard of review to rule on Dr. Kuykendall's accompanying but unaddressed

51

motion for summary judgment on the causation element of Kipfinger's claim. *See Williams v. Fulton*, 632 P.2d 920, 923 n.4 (Wash. Ct. App. 1981) (citations omitted). *See also Shimsky*, 208 Mont. at 189-90, 676 P.2d at 1310 (on review of case disposed of as a matter of law on summary judgment, this Court "is free to make its own examination of the entire case and to make a determination in accordance with its findings"—citations omitted).[98] We have similarly recognized that, in the interests of judicial economy and avoidance of further delay, we have discretion under § 3-2-204, MCA, to reach and decide other issues amenable to judgment as a matter of law on the appellate record when necessary to final determination of the matter on the merits. *See* § 3-2-204, MCA (general scope of appellate review); *State v. Rose*, 2009 MT 4, ¶ 37, 348 Mont. 291, 202 P.3d 749 (discretionary review of related speedy trial claim not at issue on appeal in interests of "judicial economy and fairness" to avoid "further delay" where review merely required application of pertinent law to necessary findings of fact previously determined); *Orr v. State*, 2004 MT 354, ¶ 49, 324 Mont. 391, 106 P.3d 100 (discretionary Rule 56 review in interest of judicial economy of unreached summary judgment issue likely to arise again on remand in wake of reversal of dismissal on duty element of asbestos injury claims); *State v. Muhammad*, 2002 MT 47,

---

[98] *Accord King v. State*, 259 Mont. 393, 396, 856 P.2d 954, 955 (1993) ("[w]hen a case is dismissed pursuant to a pretrial motion" and witness credibility is not at issue, "the scope of review is broad and this Court may make its own examination of the entire case and make a determination in accordance with its findings"—citing *Shimsky*), *overruled on other grounds by Estate of Strever v. Cline*, 278 Mont. 165, 178, 924 P.2d 666, 673 (1996); *Turbiville v. Hansen*, 233 Mont. 487, 490, 761 P.2d 389, 391 (1988) ("[t]his Court's review of a summary judgment is based on its examination of the entire case"—citing *Shimsky*); *Hudson*, 229 Mont. at 429, 747 P.2d at 223 (quoting *Shimsky*).

¶ 43, 309 Mont. 1, 43 P.3d 318 (discretionary review of normally-remanded related issue of law not raised by either party in interests of "judicial economy").

¶44    Accordingly, here, Dr. Kuykendall does not dispute that E.C. was diagnosed with HIE and related brain conditions by qualified physicians at the Seattle Children's Hospital soon after his C-Section birth.  Further, viewed in context and in the light most favorable to the non-moving party as required under M. R. Civ. P. 56, the purported pleading "concessions" in Kipfinger's amended complaint, as selectively characterized and asserted by Dr. Kuykendall, cannot be reasonably construed in context as admissions or concessions contradicting or qualifying Kipfinger's asserted medical malpractice claim, whether as originally-pled in her amended complaint or as supplemented in pertinent portions of the Rule 56 factual record.  Moreover, regardless of its evolution upon completion of discovery, Kipfinger's asserted causation theory is not limited to the truncated assertion, as selectively characterized by Dr. Kuykendall, that her alleged negligence caused E.C. to develop hypoxic-ischemic injury and/or HIE *before* C-Section extraction.

¶45    As manifest in the Rule 56 factual record and briefing below, Kipfinger's asserted causation theory is two-fold.  She first asserts that Dr. Kuykendall's alleged negligence *before* C-Section extraction (i.e., her failure to correctly interpret E.C.'s FHR tracings and resulting failures to order a fetal scalp lead for internal FHR monitoring, earlier diagnose the presence of meconium and risk of meconium aspiration, timely recognize E.C.'s transition from ACOG Category II FHR tracings to Category III tracings that were no longer reparable by intrauterine resuscitation measures, and order a C-Section no later than

53

3:20 p.m. rather than 50 minutes later), caused E.C. to suffer unnecessary intrauterine stress, which in turn rendered him less able to avoid or minimize the risk of post-extraction oxygen deprivation and development of severe acidosis in the event of delay in airway establishment and resuscitation necessitated by meconium aspiration-related airway blockage. Second, Kipfinger further asserts that Dr. Kuykendall's *pre-extraction failure* to have qualified NICU team personnel, whether a neonatologist or a qualified NICU RT capable of intubation and complete resuscitation, present at C-Section extraction resulted in significant delay in post-extraction airway establishment and resuscitation of the already non-responsive oxygen-depleted newborn, further prolonged oxygen deprivation, development of severe acidosis, and resulting hypoxic-ischemic injury and HIE. Kipfinger's two-fold causation theory is supported by:

(1)     Dr. Harlass's deposition testimony that:

   (A)     as of 3:20 p.m., E.C. had ACOG Category III tracings that were not abatable by further intrauterine resuscitation measures;

   (B)     though E.C. had only slight or mild acidosis at birth, i.e., a "little thimblefull," he soon developed "a cupful" "down the road";[99] and

   (C)     though E.C. showed no sign of significant acidosis or HIE at birth, the risk of developing significant acidosis significantly increased the longer the delay in post-extraction airway establishment and resuscitation;[100]

---

[99] Harlass Depo. at 179.

[100] Harlass Depo. at 140-41, 171-81, and 195.

54

(2)　the Rule 26(b)(4) disclosure report of Dr. Harry Wilson, MD, board-certified pediatric pathologist and pediatrician, that E.C.'s medical records indicate that:

(A)　intrauterine-stress-produced "meconium passage occurred between 4 and 12 hours prior to delivery";

(B)　E.C. "experienced further additive acute placental compromise" in utero which "led to increased fetal vulnerability in tolerating any further compromise with the definitive fetal HR emergent stress changes as reported then unequivocally manifest";

(C)　"[t]he emergency C-Section delivery phase of this process was marked by the [4:47 p.m.] delivery time [placental] cord gas results" which "indicated acute hypoxia, acute hypercapnia, and a non-acidotic systemic condition with basically still intact bicarbonate (in blood) reserves";

(D)　placental cord gasses at birth indicated "acute hypoxia" and "marked fetal distress," inter alia, but E.C.'s "metabolic reserves were still present" and, at that time, "any potential acidotic brain injury still would be limited";

(E)　E.C. was "born from a survivable chronic stress environment [and] went into a non-supportive post-delivery environment where near lethal type acidosis ensued as a result of lower airway and intra pulmonary airway obstruction by a meconium aspiration mechanism with meconium pushed into the lungs by PPV administered before needed airway clearing. . . .  Not clearing the airway properly led to the prolonged hypercapnia [elevated $CO_2$ levels] causing a persistent acidosis and toxic loss of blood buffer reserves.  It was this acidosis that created the severe brain injury that so tragically has affected this now 4 year old forever damaged human being";

(F)　"[u]pon fetal extraction delivery it became apparent and unfortunate that . . . both of the reported [nurse] attempts to suction meconium from the newborn infant airway in the 1st minute of extra uterine life [were unsuccessful]. . . .  [T]he hypercapnia and acidosis worsened because blood buffer reserves were depleted and the distal airway was obstructed.  Acute hypercapnia now became chronic base deficit on the blood gas chart and a near lethal acidosis was the result"; and

(G)     "the brain injury suffered by [E.C.] was due to a near lethal exposure to respiratory failure and severe acidosis after . . . emergency C-Section delivery";

(3)     Dr. Wilson's supplemental deposition testimony that:

(A)     E.C.'s metabolic blood oxygen "reserves" prior to placental severance at birth were "not bad" because the "placenta was [still] doing its job" including "getting rid of carbon dioxide";[101]

(B)     but when the placenta is severed at birth, "then that's when you get into how much resiliency" does the newborn "have to be able to survive . . . labor and delivery" because when newborns "are being delivered, they are in a situation of metabolic and respiratory stress, and their base excess gets consumed;"[102] and

(C)     what E.C. "had lost up to that point of [placental severance] was the resiliency and the capacity to survive the stress of delivery"—"not that the brain was damaged, but the brain was going to be vulnerable, if continuation of that inadequate environment occurred. . . . [U]nfortunately for this child, that continuation to a major extent of a bad environment occurred after delivery. . . . [T]he child's brain was still intact at delivery, without evidence of severe acidosis[,] [b]ut after delivery, when no adequate rescue occurred, . . . the pH just went out of site and the buffer [blood] reserves were fully consumed and gone";[103]

(4)     the deposition testimony of Dr. Steven A. Ringer, MD, neonatologist, as to "whether if the [NICU] team had arrived" sooner, E.C. would "still have likely experienced some sort of . . . neurological injury" under the circumstances because:

> every additional minute of delay puts the baby [at] greater risk.
> So, . . . had this gone on for three minutes, as opposed

---

[101] Wilson Depo. at 113-14.

[102] *Id.*

[103] Wilson Depo. at 115-18.

to . . . 8 or 11 minutes, my opinion is that he probably would be better off than he was;[104]

(5)     the Rule 26(b)(4) report of Dr. Dale Bull, MD, PhD, FAAP, a board-certified pediatrician and neonatologist with a sub-specialty in perinatal-neonatal medicine, that:

> There is evidence that [E.C.'s] brain damage and disabilities were caused by loss of oxygen and blood flow to his brain that continued after his birth. The evidence of [HIE] that he suffered is due in part to the prolonged delay in his resuscitation at the time of his birth. [His] umbilical cord blood gases . . . show only sub-critical hypoxia and ischemia prior to the infant's delivery. The first blood gas at approximately an hour of age demonstrates that his delivery and severely flawed resuscitation resulted in severe hypoxic-ischemic injury.

> . . . The [HIE] to his brain began during labor (intrapartum) and worsened after birth (antepartum) as a result of his flawed resuscitation; acute ischemic events within several hours before and after delivery caused the injury.

> The most likely cause of [his] seizures in the first day of life is HIE and during his nursery stay [at the hospital] there was no evidence that something other than HIE caused him to seize.

> I express these opinions and allegations backed by a great deal of medical certainty based on my years of training and experience;

(6)     the Rule 26(b)(4) report of Dr. Sanjay P. Prabhu, MBBS, FRCR, a staff pediatric neuroradiologist, Director of the Advanced Image Analysis Lab, Medical Director of Imaging Informatics at the Boston Children's Hospital, and Assistant Professor of Radiology at the Harvard Medical School, that:

(A)     treatment records and imaging of E.C.'s brain taken five days after birth manifest various brain "abnormalities" "consistent with [an initial] hypoxic-ischemic injury," primarily caused by "severe total/near total hypoxia" "with complete loss of blood flow," that

---

[104] Ringer Depo. at 119.

occurred in the "time period 24 hours prior to birth and not more than a day after birth";

(B) "the more peripheral areas of abnormality in [his] white matter suggest a second episode of prolonged partial hypoxia occurring within a few hours from the [initial] severe total hypoxic episode"; and

(C) "the opinions addressed in this report represent my best medical opinion, in line with [referenced] published peer-reviewed literature . . . and are expressed to a reasonable degree of medical certainty."[105]

¶46 Contrary to Dr. Kuykendall's briefing assertions below, the fact that Dr. Harlass's obstetric and maternal-fetal care practice and expertise may not have included the actual *diagnosis* of HIE does not disqualify him under § 26-2-601(1)-(2), MCA, or M. R. Evid. 702, from rendering an opinion that E.C. was *at risk* of developing severe acidosis and resulting HIE under the circumstances in this case. Nor does the fact that, since ceasing his prior practice as a board-certified pediatrician, Dr. Wilson has practiced exclusively as a pediatric pathologist for the last nine years disqualify him from rendering opinions regarding the causes of intrapartum and neonatal hypoxic-ischemic injury and HIE. The facts that Dr. Prabhu, a manifestly credentialed and experienced pediatric neuroradiologist, is not a clinician or board-certified "subspeciali[ist] [in] diagnostic radiology" similarly do not disqualify him from rendering opinions, based on radiological brain imaging analysis,

---

[105] As decried by the District Court, only a few pinpoint citations to the above-noted expert opinions were included in Kipfinger's opposition briefing. But, except for the Harlass deposition later requested and considered by the District Court, all of the referenced source materials were filed of record, whether in excerpts attached to Kipfinger's supporting statement of purported undisputed facts or previously filed discovery materials.

58

regarding the timing and cause of E.C.'s HIE. Dr. Kuykendall does not assert, and certainly has not shown, that any of those medical professionals are not manifestly qualified experts in their respective fields regarding the subject matters upon which they have rendered opinions in this case. Section 26-2-601(1)-(2), MCA, surely precludes otherwise qualified medical experts from rendering opinions regarding the standard of care and breach elements of a medical malpractice claim unless similarly licensed, experienced, and/or accredited in the same medical discipline and practice as the alleged tortfeasor. However, it does not similarly apply, or impose such additional restrictions, to preclude experts who are otherwise qualified under M. R. Evid. 702 from rendering expert opinions regarding the *nature and medical causation of* the alleged *injury or condition* at issue. *See* § 26-2-601(1)-(2), MCA (limiting expert testimony "relating to negligence and standards of care and practice" in medical malpractice actions). While trial courts generally have broad threshold discretion under M. R. Evid. 702 to determine whether a proffered witness is qualified to render expert opinion testimony regarding a particular subject matter, "the degree of [an] expert's qualifications" above that minimum threshold merely goes to the weight of his or her opinion testimony rather than its admissibility. *Mont. Political Practices Comm'r v. Wittich*, 2017 MT 210, ¶ 51, 388 Mont. 347, 400 P.3d 735 (citing *Wacker v. Park Rural Elec. Coop.*, 239 Mont. 500, 501-02, 783 P.2d 360, 361 (1989)); *Beehler*, ¶ 23; *Little v. Grizzly Mfg.*, 195 Mont. 419, 427, 636 P.2d 839, 843 (1981) (internal citation omitted).

59

¶47 By citation to isolated snippets from their respective Rule 26(b)(4) reports and/or supplemental deposition testimonies, Dr. Kuykendall further asserted below that the substance of the opinions rendered by Drs. Harlass, Wilson, Ringer, Bull, and Prabhu in any event precluded Kipfinger from demonstrating the existence of a genuine issue of material fact regarding causation. However, similar to disputes regarding the degree of an otherwise qualified expert's expertise regarding a particular subject matter, "gaps or inconsistencies" in an otherwise qualified expert's testimony generally "go to the weight" of his or her testimony, not its admissibility. *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 133-34 (2d Cir. 2006) (citation omitted). *Accord Beehler*, ¶ 23 ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"—citations and internal punctuation omitted); *State v. Clifford*, 2005 MT 219, ¶ 28, 328 Mont. 300, 121 P.3d 489 (essential Rule 702 focus is whether subject "field" of expertise "is reliable," the subject witness "is qualified as an expert" in that field, and whether expert "reliably applied the reliable field to the facts" at issue—when the expert is qualified in the subject field "the traditional and appropriate means of attacking" any allegedly "shaky but admissible evidence" is by "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"—citation omitted); *Stewart v. Casey*, 182 Mont. 185, 193, 595 P.2d 1176, 1180 (1979) ("if opposing counsel believe the [expert's] opinion is not founded on sufficient data, cross-examination is the shield to guard against unwarranted opinions"); *M.B. ex rel. Scott v. CSX Transp.,*

*Inc.*, 130 F. Supp. 3d 654, 665 (N.D. N.Y. 2015) ("rejection of expert testimony is the exception rather than the rule" under Rule 702); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1084-85 (D. Colo. 2006) (threshold Rule 702 requirement for "reliable methodology" does not require proof "that the expert is indisputably correct"—internal punctuation and citations omitted).

¶48    We therefore hold that genuine issues of material fact precluded summary judgment on the causation element of Kipfinger's medical malpractice claim against Dr. Kuykendall. As with the other elements of the claim, it is for the finder of fact to determine at trial the relative merits of the parties' conflicting evidence regarding causation of E.C.'s undisputed brain injuries and conditions in this case.

## CONCLUSION

¶49    We hold that genuine issues of material fact precluded summary judgment on the standard of care and breach elements of Kipfinger's medical malpractice claim, and that the District Court thus erroneously granted summary judgment to Dr. Kuykendall on those elements.    We hold further that genuine issues of material fact similarly precluded summary judgment on the causation element of Kipfinger's claim.    We therefore reverse and remand for further proceedings in accordance with this Opinion.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE